Dennis J. MURPHY, Director of the Rhode Island Department of Natural Resources, Plaintiff-Appellant,

v.

John J. O'BRIEN, District Director of Internal Revenue, and Robert J. Pettrucci, Acting Stabilization Manager, Defendants-Appellees.

No. 1–2.

Temporary Emergency Court of Appeals.

Oct. 10, 1973.

W. Slater Allen, Jr., Asst. Atty. Gen., for the State of Rhode Island (Richard J. Israel, Atty. Gen., on the brief), for appellant.

Paul T. Michael, Atty. U. S. Dept. of Justice (Irving Jaffe, Acting Asst. Atty. Gen., William E. Nelson and Stanley D. Rose, Attys., Dept. of Justice, on the brief), for appellees.

Before TAMM, Chief Judge, and VAN OOSTERHOUT and HASTINGS, Judges.

HASTINGS, Judge.

Appellant Murphy, the Director of the Rhode Island Department of Natural Resources, brought this action in the district court to enjoin appellee United States officers from acting to prevent the collection of parking fees at certain state owned beaches in Rhode Island. It is the Government's position that these fees represent price increases illegally instituted during the 60-day price freeze which initiated Phase IV of the President's economic stabilization program. The principal issues raised on this appeal are (1) whether the Cost of Living Council (CLC) acted within its authority under the Economic Stabilization Act of 1970, as amended,[1] and Executive Order No. 11723 issued pursuant thereto, in issuing regulations which forbid these charges; and (2) whether the Act, as applied, unconstitutionally infringes upon Rhode Island's right to raise revenue for legitimate state ends.

On May 15, 1973, the Governor of Rhode Island approved a bill (hereinafter "S533") providing that parking fees be charged at all Rhode Island state beaches having parking facilities.[2] The present dispute concerns five beaches at which facilities were already in existence and theretofore available to the public free of charge.[3] Bill S533 authorized an annual parking fee, restricted to Rhode Island residents, of between $3 and $5 per vehicle, as well as daily fees of $1 per vehicle on weekdays and $2 per vehicle on weekends. Annual fees received under S533 were to be used "for the maintenance and improvement and acquisition of beach facilities."

The first sales of annual permits under the new law occurred during the week of May 21, 1973. Daily tickets did not go on sale until June 16, which was designated the official opening date for use of the beaches. Prior to June 16 beach parking facilities remained available to the public free of charge, and the record indicates that the beaches themselves were open for some time prior to the official opening date. Sales of annual permits in the period May 21–June 28 totaled 5,030 at a price of $5 each.

On June 13, 1973, the President issued Executive Order No. 11723, 38 Fed.Reg. 15765 (June 15, 1973), imposing a comprehensive price freeze on all commodities and services (except raw agricultural products) for a maximum period of 60 days. Section 1 of that order states:

Effective 9:00 p. m., e. s. t., June 13, 1973, no seller may charge to any

---

1. 12 U.S.C.A. § 1904 n.

2. "SEC. 42–17.1–9.1 Parking fees at state beaches. The Department shall charge parking fees at all State beaches where such parking facilities are furnished by this department as follows:

(a) An annual fee of $3 and $5 for all vehicles, registered in Rhode Island, which fee shall be based on the size of the vehicle as determined by the department.

(b) All other vehicles shall pay a daily fee of $1 per vehicle on weekdays and a fee of $2 per vehicle on each Saturday, Sunday and holiday.

(c) Annual fees shall be retained by the state and shall be used for the maintenance and improvement and acquisition of beach facilities."

3. Appellant states in his brief that parking fees were charged prior to S533 at one state beach, Misquamicut, which caters primarily to nonresident visitors.

class of purchaser and no purchaser may pay a price for any commodity or service which exceeds the freeze price charged for the same or a similar commodity or service in transactions with the same class of purchaser during the freeze base period. * * *

Section 8 defines "freeze base period" as

(a) the period June 1 to June 8, 1973; or

(b) in the case of a seller who had no transactions during that period, the nearest preceding seven-day period in which he had a transaction.

Finally, "transaction" is defined by Section 8 as

* * * an arms length sale between unrelated persons and is considered to occur at the time of shipment in the case of commodities and the time of performance in the case of services.

On June 28, 1973, appellee O'Brien informed Murphy that the collection of beach parking fees under S533 was in violation of Executive Order 11723 and the Cost of Living Council regulations issued thereunder, 38 Fed.Reg. 15768 (June 15, 1973), and ordered him to cease fee collections at the five affected state beaches. On July 5 the present action was initiated in the district court challenging such order. On July 24 the trial court, acting on stipulated facts, entered an order denying appellant's request for preliminary and permanent injunctive relief and requiring appellant to submit a plan for refunding the amounts illegally collected.[4] On August 6 this court stayed the remedial provision of that order pending this appeal.

Appellant's primary argument is that the parking charges initiated by S533

are properly characterized as "use taxes" rather than as "fees." We find it unnecessary to resolve this issue, since the distinction pressed by appellant is irrelevant to the outcome of this case.

In the first place, it is clear that the CLC freeze regulations apply the freeze to these parking charges regardless of label. After stating that the freeze does not apply to transactions "which are not prices within the meaning of the act,"[5] the regulations specify, *inter alia*, that "state or local income, sales and real estate taxes" are thereby excluded. § 140.1(c), 38 Fed.Reg. 15768 (June 15, 1973). That "prices" charged by governments are not exempt from the freeze is made clear by § 140.2, which defines persons covered by the freeze to include "a government, and any agency or instrumentality of a government." The CLC interpreted its regulations in a series of releases in the form of questions and answers concerning the freeze, published during the freeze period. Release No. 8, 38 Fed.Reg.17490 (July 2, 1973), contains the following:

3. Q. May State or local taxes be increased during the freeze?

A. Yes. State and local taxes are exempt from the freeze since they are not prices within the meaning of the Economic Stabilization Act. These taxes include *general purpose taxes* such as income, sales and property taxes. (Emphasis supplied.)

. . . . . .

5. Q. Can the fees or charges which a State or local government charge for services provided by the governments be increased during the freeze?

---

4. On July 5 the court had entered a temporary restraining order on the condition that the state "maintain appropriate signs at the entrance to each of the beaches * * * advising patrons that the imposition of parking fees is being challenged by the United States Government * * *" and that "said signs further advise that should the United States Government be successful,

patrons will be entitled to a refund * * *." This was subsequently dissolved in the trial court's order of July 24, 1973.

5. Section 203 of the Economic Stabilization Act of 1970 authorizes the President to issue orders and regulations to "stabilize prices, rents, wages, and salaries * * *." 12 U.S.C.A. § 1904 n.

A. No. Fees for water, gas, sewer and similar services are considered prices for particular services and are subject to the freeze. *No matter what a State or local government may call a fee or charge for a specific public service, if that government is imposing a user charge, then the charge is covered by the freeze.* (Emphasis supplied.)

Both the regulations and the later questions and answers release indicate that the Council treats governmental service charges as "prices" within the meaning of the Act, regardless of whether they are technically "use taxes" or "user fees." All that is required is that the charge be for a "specific public service," which obviously includes parking facilities, and that it be levied against "users." This interpretation of the Act by the CLC is entitled to great deference from a reviewing court, University of Southern California v. Cost of Living Council, 472 F.2d 1065, 1068 (T. E.C.A.1972), cert. denied 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973), and appellant has failed to demonstrate that the Council's rulings are unreasonable or arbitrary and capricious.[6] In any event, we have no difficulty in finding that the parking charges here challenged are in fact "prices" and are thus susceptible of regulation by the executive pursuant to the Act.

In light of the foregoing, it appears that appellant's primary purpose in insisting that these charges are "taxes" is to emphasize his claim that this application of the Economic Stabilization Act unconstitutionally restricts

Rhode Island in its collection of revenue. "Tax" connotes the power of a sovereign, whereas "fee" evokes more mundane images. Semantics aside, the issue raised by appellant is, simply, whether the Constitution precludes Congress from enacting legislation which has the effect of preventing a state from raising revenue in the otherwise lawful manner here adopted.[7]

Otherwise valid federal legislation, e. g., the Economic Stabilization Act, which incidentally interferes with state affairs has in recent times been uniformly upheld by the Supreme Court. Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968); Case v. Bowles, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946); New York v. United States, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946); United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936). The most thorough discussion of the question is found in New York v. United States, *supra*, a case involving federal taxation of the sale of mineral waters by a state. In upholding the federal tax, Mr. Justice Frankfurter suggested that federal interference is constitutionally suspect only where Congress discriminates against states as such:

\* \* \* [S]o long as Congress generally taps a source of revenue by whomsoever earned and not uniquely capable of being earned only by a State, the Constitution of the United States does not forbid it merely because its incidence falls also on a State. *Id.* 326 U.S. at 582, 66 S.Ct. at 314.

---

6. Appellant urges that CLC's interpretation is inconsistent with its prior practice in that state and local user fees were excluded from controls under Phases II and III. The reason for that exclusion was not, however, the belief that such fees were outside the scope of the Act. Rather, the Council recognized that strict controls over fees could be avoided simply by raising general taxes; hence, "coverage of fees would be meaningless." Cost of Living Council News No. 47, Dec. 23, 1971. It is no abuse of discretion for the Council

to reach a different conclusion in the process of implementing a short term general price freeze where the opportunity for avoidance through general tax increases is minimal.

7. Appellant's constitutional claims are before us on appeal, rather than pursuant to the mandatory certification procedure set forth in § 211(c) of the Act, because the trial court determined that the constitutional issues were not substantial.

Chief Justice Stone concurred in the decision on the grounds, *inter alia*, that the challenged exercise of federal power "does not curtail the business of the state government more than it does the like business of the citizen." *Id.* at 588–589, 66 S.Ct. at 317. The Chief Justice also stated that even a non-discriminatory tax might face constitutional objection if it "unduly interferes with the performance of the State's functions of government." *Id.* at 588, 66 S.Ct. at 317.

More recently, in Maryland v. Wirtz, *supra*, the Court implied that the concept of state sovereignty no longer imposes any limit on the authority of Congress to legislate pursuant to a valid Congressional power.[8] 392 U.S. at 195, 88 S.Ct. at 2017. Even under the *New York* case, however, it is clear that the Economic Stabilization Act as here applied is constitutional. The Act neither "unduly interferes" with Rhode Island's ability to function as a government nor discriminates against states in general or Rhode Island in particular. The interference here was short lived, did not impair Rhode Island's ability to raise revenue by means of sales, income or real estate taxes, and arose only as an incident of a uniform, nationwide program of price regulation.

There remains the question whether the Act as applied is a valid exercise of Congressional power under the Commerce Clause. In this connection appellant argues there has been no showing that any out of state patrons actually used the beach parking lots here involved. Such a showing is unnecessary, however.[9] Activity which is wholly intrastate may be regulated by Congress where such activity, combined with like activity by others similarly situated, substantially affects commerce among the states or with foreign nations. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L.Ed. 122 (1942). There is little difficulty finding such an effect from the Act, inasmuch as its essential purpose is to control inflation.[10]

In addition to the "use tax" argument, appellant raises two further objections. First, appellant contends that the parking fees were already in effect during the freeze base period and therefore do not represent price increases prohibited by Executive Order 11723. Appellant relies on the fact that some 716 annual permits were sold prior to June 8 even though annual permits or daily tickets were not required for parking until June 16, three days after the freeze was imposed.

In University of Southern California v. Cost of Living Council, *supra*, this court held that ticket price increases for football games played during the Phase I freeze[11] were unlawful despite substantial advance sales of tickets prior to and during the freeze base period. That decision was based on a ruling by the Office of Economic Preparedness that a service "transaction," for purposes of determining base price, takes place at the time the service is performed. See 36 Fed.Reg. 17578 (1971). The same principle is incorporated in the definition of transaction found in Section 8 of Executive Order 11723, quoted above, and in § 140.2 of the freeze regulations. See also Questions and Answers Release No. 4, 38 Fed.Reg. 16651 (June

---

8. *Wirtz* held that the Fair Labor Standards Act as amended may be constitutionally applied to wages paid by state governments.

9. This is not a case involving the question whether a state user fee imposes an unconstitutional burden on interstate commerce. *Compare* Evansville–Vanderburgh Airport Authority District v. Delta Airlines, Inc., 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).

10. Section 202 of the Act recites the Congressional determination that "in order to stabilize the economy, reduce inflation, minimize unemployment, improve the Nation's competitive position in world trade, and protect the purchasing power of the dollar, it is necessary to stabilize prices, rents, wages, salaries, dividends, and interest * * *."

11. Executive Order No. 11615, 36 Fed.Reg. 15727 (1971).

25, 1973). Here the services which were the subject of the fees were not performed until sometime after June 16. The transactions represented by the fees must therefore be deemed to have occurred after the freeze base period. In contrast, parking services performed during the base period were provided free of charge.[12]

Appellant attempts to distinguish *Southern California* as involving an "event fixed in time." We see no reason to limit the application of that case to fixed events. Nor can the fact that the annual permits were valid beyond the 60-day freeze excuse their unlawful effect during that period.

■ Finally, appellant argues that the parking fees financed a "new service" within the meaning of § 140.12 of the freeze regulations.[13] Appellant bases his claim on a literal reading of the definition of "new service" in the regulation. Under that definition, a commodity or service is "new" if:

(i) The offering person did not sell or lease it in the same or substantially similar form at any time during the 1-year period immediately preceding the first date on which he offers it for sale or lease. * * *; and

(ii) It is substantially different in purpose, function, quality, or technology, or its use or service effects a substantially different result from any other commodity or service which the offering person currently sells or leases or sold or leased at any time during the 1-year period immediately preceding the first date on which he offers it for sale or lease. § 140.12(c)(1), 38 Fed.Reg. 15769 (June 15, 1973).

Since parking facilities were offered *free* of charge prior to June 16, appellant argues that Rhode Island did not "sell or lease" the service during the preceding year; therefore the service is new. We believe, however, that the words "did not sell or lease" with reference to the preceding one year period are intended only to indicate an absence of transactions, and not to express a requirement that prior transactions have been performed for a price. Certainly the interpretation urged by appellant is inconsistent with the purpose of the freeze, inasmuch as instituting a charge for what was formerly free is no less inflationary than raising an existing price.

Appellant's contention that the parking service was offered to a new market within the meaning of § 140.12(c)(2) likewise is without merit.

The trial court's final order required appellant to submit a refund plan to the court within ten days. Our stay of that order is hereby dissolved and the cause is remanded to the district court for remedial proceedings in accordance therewith.

Affirmed.

---

12. This is true regardless of whether the "off-season" period of June 1–8 or the next preceding seven-day period during an "official" season (presumably during the summer of 1972) is the correct base period here.

13. If so, Rhode Island would be permitted to set a price in accordance with formulas contained in § 140.12(a).