# FRY ET AL. *v.* UNITED STATES

No. 73–822.  Argued November 11, 1974—Decided May 27, 1975

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, and POWELL, JJ., joined. DOUGLAS, J., filed a separate statement, *post*, p. 549. REHNQUIST, J., filed a dissenting opinion, *post*, p. 549.

*John A. Brown* argued the cause and filed briefs for petitioners.

*Deputy Solicitor General Lafontant* argued the cause for the United States. On the brief were *Solicitor General Bork, Assistant Attorney General · Hills, Deputy Solicitor General Friedman, William L. Patton,* and *William G. Kanter.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

The Economic Stabilization Act of 1970[1] authorized the President to issue orders and regulations to stabilize wages and salaries at levels not less than those prevailing

---

*Briefs of *amici curiae* urging reversal were filed by *Evelle J. Younger,* Attorney General, *Willard A. Shank,* Assistant Attorney General, and *Talmadge R. Jones,* Deputy Attorney General, for the State of California; by *William J. Brown,* Attorney General, *Robert B. Meany,* Assistant Attorney General, and *James A. Laurenson* for the State of Ohio; by *John C. Danforth,* Attorney General, and *Gene E. Voigts* for the State of Missouri; by *Loren E. McMaster* for the California State Employees' Assn.; and by *Stephen S. Boynton* for the Assembly of Governmental Employees.

*A. L. Zwerdling, Robert H. Chanin,* and *George Kaufmann* filed a brief for the Coalition of American Public Employees as *amicus curiae* urging affirmance.

[1] Title II of the Act of Aug. 15, 1970, Pub. L. 91–379, 84 Stat. 799, as amended, note following 12 U. S. C. § 1904 (1970 ed., Supp. I). The Act was extended five times before it expired on April 30, 1974.

on May 25, 1970. By Executive Order, the President created the Pay Board to oversee wage and salary controls imposed under the Act's authorization. Exec. Order No. 11627, 3 CFR 218 (1971 Comp.), note following 12 U. S. C. § 1904 (1970 ed., Supp. I). In implementing the wage stabilization program, the Pay Board issued regulations that limited annual salary increases for covered employees to 5.5% and required prior Board approval for all salary adjustments affecting 5,000 or more employees.[2] The State of Ohio subsequently enacted legislation providing for a 10.6% wage and salary increase, effective January 1, 1972, for almost 65,000 state employees.[3] The State applied to the Pay Board for approval of the increases, and a public hearing was held. In March 1972, the Board denied the application for an exemption to the extent that it exceeded salary increases of 7% for the 1972 wage year.[4] Petitioners, two state employees, sought a writ of mandamus in state court to compel Ohio officials to pay the full increases provided in the state pay act. The Ohio Supreme Court granted the writ and ordered the increases to be paid. *State ex rel. Fry* v. *Ferguson*, 34 Ohio St. 2d 252, 298 N. E. 2d 129 (1973).

[2] 6 CFR §§ 101.21, 201.10 (1971). See also 6 CFR § 101.28 (1972).

[3] Ohio Rev. Code Ann. § 143.10 (A) (Supp. 1972). The Act provided for salary increases for employees of the state government, state universities, and county welfare departments. Elected state officials were not included.

[4] The Pay Board determined that the implementation of the pay increase from March 1972 to November 1972 would reduce the effective rate to 7% for the wage year November 14, 1971, to November 13, 1972. The payments in issue here therefore represent the wages and salaries that were due from January 1, 1972, when the pay increase was to take effect, to March 16, 1972. The total amount involved is $10.5 million.

After the State Supreme Court decision, the United States filed this action in the District Court to enjoin Ohio and its officials from paying wage and salary increases in excess of the 7% authorized by the Pay Board. The District Court certified to the Temporary Emergency Court of Appeals the question of the applicability of federal wage and salary controls to state employees. See § 211 (c) of the Economic Stabilization Act, note following 12 U. S. C. § 1904 (1970 ed., Supp. I).

The Court of Appeals construed the Act as applying to state employees and as thus construed upheld its constitutionality. *United States* v. *Ohio,* 487 F. 2d 936 (1973). Relying on the decisions of this Court in *Maryland* v. *Wirtz,* 392 U. S. 183 (1968), and *United States* v. *California,* 297 U. S. 175 (1936), the court concluded that the interference with state affairs incident to the uniform implementation of federal economic controls was of no consequence since Congress had a rational basis upon which to conclude that the state activity substantially affected commerce. The Court of Appeals accordingly enjoined the payment of wage and salary increases in excess of the amount authorized by the Pay Board. We affirm.

## I

At the outset, it is contended that Congress did not intend to include state employees within the reach of the Economic Stabilization Act and that the Pay Board therefore did not have the authority to regulate the compensation due state employees.[5] We disagree. The language and legislative history of the Act leave no doubt

---

[5] Petitioners did not raise the statutory issue either in their petition for certiorari or in their brief. Rather than decide a constitutional question when there may be doubt whether there is any statutory basis for it, however, we deal first with the statutory question, which is addressed in the briefs of *amici curiae* seeking reversal.

that Congress intended that it apply to employees throughout the economy, including those employed by state and local governments. The Act contemplated general stabilization of "prices, rents, wages, salaries, dividends, and interest," § 202, note following 12 U. S. C. § 1904 (1970 ed., Supp. I), and it provided that the controls should "call for generally comparable sacrifices by business and labor as well as other segments of the economy." § 203 (b)(5). It contained no exceptions for employees of any governmental bodies, even at the federal level.[6] The failure of the Act to make express reference to the States does not warrant the inference that controls could not be extended to their employees. See *Case* v. *Bowles,* 327 U. S. 92, 99 (1946); *United States* v. *California,* 297 U. S., at 186. Indeed, in framing the Act, Congress specifically rejected an amendment that would have exempted employees of state and local governments. 117 Cong. Rec. 43673–43677 (1971). And the Senate Committee Report makes it plain that the Committee considered and rejected a proposed exemption for the same group. S. Rep. No. 92–507, p. 4 (1971). It is clear, then, that Congress intended to reach state and local governmental employees. The only remaining question is whether it could do so consistent with the constitutional limitations on its power.

---

[6] Congress did provide for the exemption of certain categories of employees, such as members of the working poor, those earning substandard wages, and those entitled to wage increases under the Fair Labor Standards Act. §§ 203 (d) and (f), note following 12 U. S. C. § 1904 (1970 ed., Supp. I). See also §§ 203 (c)(1)–(3), (f)(2), (3), and (g). The various stabilization agencies have uniformly interpreted the Act to include the States within its scope, see 36 Fed. Reg. 21790, 25428 (1971); 37 Fed. Reg. 1240, 24961, 24989–24991 (1972). We have long recognized that the interpretation of a statute by an implementing agency is entitled to great weight. *Udall* v. *Tallman,* 380 U. S. 1, 16–18 (1965).

## II

Petitioners acknowledge that Congress' power under the Commerce Clause is very broad. Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations. See *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 255 (1964); *Wickard* v. *Filburn,* 317 U. S. 111, 127–128 (1942). There is little difficulty in concluding that such an effect could well result from large wage increases to 65,000 employees in Ohio and similar numbers in other States; *e. g.,* general raises to state employees could inject millions of dollars of purchasing power into the economy and might exert pressure on other segments of the work force to demand comparable increases.

Petitioners do not appear to challenge Congress' conclusion that unrestrained wage increases, even for employees of wholly intrastate operations, could have a significant effect on commerce. Instead, they contend that applying the Economic Stabilization Act to state employees interferes with sovereign state functions and for that reason the Commerce Clause should not be read to permit regulation of all state and local governmental employees.[7]

---

[7] Petitioners have stated their argument, not in terms of the Commerce power, but in terms of the limitations on that power imposed by the Tenth Amendment. While the Tenth Amendment has been characterized as a "truism," stating merely that "all is retained which has not been surrendered," *United States* v. *Darby,* 312 U. S. 100, 124 (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system. Despite the extravagant claims on this score made by some *amici,* we are con-

On the facts of this case, this argument is foreclosed by our decision in *Maryland* v. *Wirtz,* 392 U. S. 183 (1968), where we held that the Fair Labor Standards Act could constitutionally be applied to schools and hospitals run by a State. *Wirtz* reiterated the principle that States are not immune from all federal regulation under the Commerce Clause merely because of their sovereign status. 392 U. S., at 196–197. We noted, moreover, that the statute at issue in *Wirtz* was quite limited in application. The federal regulation in this case is even less intrusive. Congress enacted the Economic Stabilization Act as an emergency measure to counter severe inflation that threatened the national economy. H. R. Rep. No. 91–1330, pp. 9–11 (1970). The method it chose, under the Commerce Clause, was to give the President authority to freeze virtually all wages and prices, including the wages of state and local governmental employees. In 1971, when the freeze was activated, state and local governmental employees composed 14% of the Nation's work force. Brief for United States 20. It seems inescapable that the effectiveness of federal action would have been drastically impaired if wage increases to this sizeable group of employees were left outside the reach of these emergency federal wage controls.

We conclude that the Economic Stabilization Act was constitutional as applied to state and local governmental employees. Since the Ohio wage legislation conflicted with the Pay Board's ruling, under the Supremacy Clause the State must yield to the federal mandate. See *Public Utilities Comm'n of California* v. *United States,* 355 U. S. 534, 542–545 (1958); *Murphy* v. *O'Brien,* 485 F. 2d 671, 675 (Temp. Emerg. Ct. App. 1973).

*Affirmed.*

---

vinced that the wage restriction regulations constituted no such drastic invasion of state sovereignty.

Mr. Justice Douglas.

Less than three months after we granted certiorari, Congress allowed the Economic Stabilization Act to expire on April 30, 1974. There is therefore no continuing impediment to the payment of salary increases of the kind at issue in this case. I would therefore dismiss the writ as improvidently granted.

Mr. Justice Rehnquist, dissenting.

Mr. Chief Justice Chase in his opinion for the Court in *Texas* v. *White*, 7 Wall. 700, 725 (1869), declared that "[t]he Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." A little over a century later, there can be no doubt that we have an indestructible Union, but the Court's opinion in this case is the latest in a series of decisions which casts some doubt upon whether those States are indeed "indestructible."

*Maryland* v. *Wirtz*, 392 U. S. 183 (1968), held that Congress could impose the provisions of the Fair Labor Standards Act upon state entities, so as to regulate the maximum number of hours and minimum wages received by state employees of hospitals, institutions, and schools. The Court's opinion in this case not unreasonably relies on *Wirtz* in holding that Congress may impose across-the-board limitations on salary increases for all state employees. In their briefs and arguments to this Court, petitioners sought to distinguish *Wirtz* on the ground that the employees there regulated were performing primarily "proprietary" functions. The Government countered this argument with language from *United States* v. *California*, 297 U. S. 175 (1936), a case which is not discussed by the Court but which was critical to the development of the doctrine which the Court today applies. There the Court held that the State of California, in

operating a railroad wholly within its own boundaries, was subject to the provisions of the Federal Safety Appliance Act.

Today's decision, like *Maryland* v. *Wirtz, supra,* and *United States* v. *California, supra,* is plausible on its facts. Congress in the Economic Stabilization Act of 1970 wished to check runaway inflation, and as a means to that end sought to control increases in wages and salaries. Since state employees constitute a significant portion of the labor force as a whole, Congress could reasonably conclude that a stabilization scheme which excluded such employees from its ambit would be less effective than one which included them. And, of course, precisely the same reasoning may be advanced in support of the result in *Wirtz* and in *United States* v. *California.*

Yet the danger to our federal system which is emphasized by these three cases taken together, as it is not by any one taken separately, seems to me quite manifest. The Tenth Amendment, the Court's opinion in this case insists, does have meaning; but the critical question is how much meaning is left to it and the basic constitutional principles which it illumines. As stated by MR. JUSTICE DOUGLAS, dissenting in *Maryland* v. *Wirtz, supra,* at 205:

> "If all this can be done, then the National Government could devour the essentials of state sovereignty, though that sovereignty is attested by the Tenth Amendment."

I do not believe that the Constitution was intended to permit the result reached today, and so I dissent.

*United States* v. *California, supra,* stated a principle of Congress' Commerce Clause power over state activities which was deemed "controlling" in *Maryland* v. *Wirtz, supra,* at 198. It is thus necessary to begin this analysis with Mr. Chief Justice Stone's opinion for a unani-

mous Court in that case. One shoulders a heavy burden of proof in seeking to demonstrate that that opinion is analytically flawed. Yet its treatment of the issue of intergovernmental immunity is less than satisfactory, even though the case may have reached a sound result upon its facts. The case was decided in 1936, at the beginning of what might be called the present era of Commerce Clause law in this Court. The Court was in the process, later completed in cases such as *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937), and *United States* v. *Darby,* 312 U. S. 100 (1941), of freeing both Congress and the States from the anachronistic and doctrinally unsound constructions of the Commerce Clause which had previously been used to deny both to the States and to Congress authority to regulate economic affairs. It is quite understandable in this context that the Court in *United States* v. *California* should have been inclined to give somewhat short shrift to a claim of "States' rights," even when invoked by the State itself against congressional authority under the Commerce Clause. The claim of "States' rights" had so frequently been invoked in the past as a form of *ius tertii,* not by a State but by a business enterprise seeking to avoid congressional regulation, that the different tenor of the claim made by the State of California may not have impressed the Court.

The Court's *California* opinion states: "The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution. The power of a state to fix intrastate railroad rates must yield to the power of the national government when their regulation is appropriate to the regulation of interstate commerce." 297 U. S., at 184. But this familiar doctrine of *The Shreveport Rate Cases,* 234 U. S. 342 (1914), that under the Supremacy

Clause even intrastate commerce which affects interstate commerce is subject to Congress' overriding authority to regulate commerce, is not a full answer to the claim of a State that it may not be regulated *as a State.* Neither California in that case, Maryland in *Wirtz,* nor Ohio in this case, questions that Congress may pre-empt state regulatory authority in areas where both bodies are otherwise competent to act. But this well-recognized principle of the Supremacy Clause is traditionally associated with federal regulation of persons or enterprises, rather than with federal regulation of the State itself, and it is difficult to understand how it supports the proposition that the States are without a constitutional counterweight which can limit Congress' exercise *against them* of its commerce power.

The Court in *California* went on to consider the analogy of constitutional immunity of state instrumentalities from federal taxation, but rejected it as "not illuminating." 297 U. S., at 184. Apparently conceding that if the principles relating to tax immunity were applied, the State would prevail, the Court rejected their relevance, saying:

"But there is no such limitation upon the plenary power to regulate commerce. *The state can no more deny the power if its exercise has been authorized by Congress than can an individual." Id.,* at 185. (Emphasis added.)

The italicized statement seems to me demonstrably wrong, and I believe it is recognized as being wrong by the Court's opinion today, with its reference to the fact that the Tenth Amendment "is not without significance." *Ante,* at 547 n. 7. In explaining why it is wrong, it is useful to explore further the situation of an individual confronted with Commerce Clause regulation. Such an individual who attacks an Act of Congress on the ground

that it is not within congressional authority under the Commerce Clause asserts only a claim of lack of legislative power. Under cases such as *The Shreveport Rate Cases, supra, Wickard* v. *Filburn,* 317 U. S. 111 (1942), and *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241 (1964), this individual's claim is ordinarily very difficult to sustain. But an individual who attacks an Act of Congress, justified under the Commerce Clause, on the ground that it infringes his rights under, say, the First or Fifth Amendment, is asserting an affirmative constitutional defense of his own, one which can limit the exercise of power which is otherwise expressly delegated to Congress. That the latter claim is of greater force, and may succeed when the former will fail, is well established. See, *e. g., Leary* v. *United States,* 395 U. S. 6 (1969); *United States* v. *Jackson,* 390 U. S. 570 (1968); *United States* v. *Cardiff,* 344 U. S. 174 (1952); *Tot* v. *United States,* 319 U. S. 463 (1943).

In this case, as well as in *Wirtz* and *United States* v. *California,* the State is not simply asserting an absence of congressional legislative authority, but rather is asserting an affirmative constitutional right, inherent in its capacity as a State, to be free from such congressionally asserted authority. Whether such a claim on the part of a State should prevail against congressional authority is quite a different question, but it is surely no answer to the claim to say that a "state can no more deny the power if its exercise has been authorized by Congress than can an individual." *United States* v. *California, supra,* at 185. Such an answer is simply a denial of the inherent affirmative constitutional limitation on congressional power which I believe the States possess.

It is not apparent to me why a State's immunity from the plenary authority of the National Government to tax, *United States* v. *Butler,* 297 U. S. 1 (1936), should

have been thought by the *California* court to be any higher on the scale of constitutional values than is a State's claim to be free from the imposition of Congress' plenary authority under the Commerce Clause. Especially is this true because the immunity from taxation has no explicit constitutional source and appears to rest solely on a concept of constitutional federalism which should likewise limit federal power under the Commerce Clause. Indeed, if history and precedent offered no guide, I would think as a matter of logic that it would be less of an encumbrance upon a State to pay a non-discriminatory tax imposed by the Federal Government than it would be to comply with nondiscriminatory regulation enacted by that Government. Where the Federal Government seeks only revenue from the State, the State may provide the revenue and make up the difference where it chooses among its sources of revenue or demands for expenditure. But where the Federal Government seeks not merely to collect revenue as such, but to require the State to pay out its moneys to individuals at particular rates, not merely state revenues but also state policy choices suffer.

Much of the law of intergovernmental tax immunity to which the Court referred in *United States* v. *California, supra,* has gone the way of all flesh, and the scope of the then-prevalent doctrine that the Federal Government might not impose a tax on an "instrumentality" of a State was shortly modified. See *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466 (1939), which made clear that today's Congress may impose an income tax on state employees.[1] Several years after the *Graves* decision,

---

[1] It may seem but a short step from Congress' requiring the employee of a State to pay a percentage of his salary to the Federal Government in the form of an income tax, on the one hand, to Congress' using its Commerce Clause authority to direct the State

however, the Court had occasion to discuss the question of intergovernmental tax immunity in *New York* v. *United States,* 326 U. S. 572 (1946). There was no opinion for the Court; Mr. Justice Frankfurter, joined by Mr. Justice Rutledge, delivered the judgment of the Court and an opinion stating that with limited exceptions the federal taxing power could be imposed on a State so long as it was not exercised in a discriminatory manner. But a majority of the Court refused to adopt this formulation of the test. Mr. Chief Justice Stone, who was the author of the Court's opinion in *United States* v. *California, supra,* spoke for himself and Justices Reed, Murphy, and Burton in stating that "we are not prepared to say that the national government may constitutionally lay a non-discriminatory tax on every class of property and activities of States and individuals alike." 326 U. S., at 586. MR. JUSTICE DOUGLAS, joined by Mr. Justice Black, dissented outright, and thought that the authority of Congress to tax revenues obtained by New York from the business of selling its mineral water could not

to pay its employees no more than a certain amount of money in the form of salaries and wages. But rough similarities in practical effect do not necessarily lead to similar holdings on the question of constitutional power. Where Congress taxes the income of a state employee, its command is addressed to the employee alone after he has performed his work for the State and received his pay therefor. Under the regulations which the Court upholds today, the State of Ohio is itself told that it may not pay more than specified amounts to its various employees. Though the economic effect of the two measures on the State may be in some respects similar, the fact that the command of Congress operates directly upon the State in the latter situation is of significance in a system of constitutional federalism such as ours. The Court in *Helvering* v. *Gerhardt,* 304 U. S. 405, 424 (1938), was careful to distinguish between the imposition of a federal income tax on the New York Port Authority, a question which it reserved, and such a tax upon an employee of the Authority, a question which it decided in favor of taxability.

be constitutionally sustained. Thus six Members of the Court, as it was then constituted, thought that the principles of federalism reflected in the Tenth Amendment to the Constitution did not stop with merely prohibiting Congress from discriminating between States and other taxable entities in the exercise of its taxing power.

In his concurring opinion, Mr. Chief Justice Stone expressed the matter as follows:

"[A] federal tax which is not discriminatory as to the subject matter may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government. The counterpart of such undue interference has been recognized since Marshall's day as the implied immunity of each of the dual sovereignties of our constitutional system from taxation by the other. . . .

". . . [I]t is plain that there may be non-discriminatory taxes which, when laid on a State, would nevertheless impair the sovereign status of the State quite as much as a like tax imposed by a State on property or activities of the national government. *Mayo* v. *United States,* 319 U. S. 441, 447–448. This is not because the tax can be regarded as discriminatory but because a sovereign government is the taxpayer, and the tax, even though non-discriminatory, may be regarded as infringing its sovereignty." 326 U. S., at 587.

The Court's decision in *Hans* v. *Louisiana,* 134 U. S. 1 (1890), offers impressive authority for the principle that the States as such were regarded by the Framers of the Constitution as partaking of many attributes of sovereignty quite apart from the provisions of the Tenth Amendment. The familiar history of this Court's

decision in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), and the subsequent reaction which gave rise to the enactment of the Eleventh Amendment, has been told and retold. *Monaco* v. *Mississippi*, 292 U. S. 313, 323–325 (1934); *Edelman* v. *Jordan*, 415 U. S. 651, 660–662 (1974). But the Eleventh Amendment by its terms forbade the federal courts only to entertain suits by the citizens of one State against another State. *Hans* v. *Louisiana* involved a suit by citizens of Louisiana against Louisiana, and was therefore not within the literal language of the Eleventh Amendment. Nevertheless this Court, after canvassing the understanding of the Framers of the Constitution and the controversial decision in *Chisholm,* unanimously. concluded that such an action would not lie, saying:

> "It is not necessary that we should enter upon an examination of the reason or expediency of the rule which exempts a sovereign State from prosecution in a court of justice at the suit of individuals. This is fully discussed by writers on public law. It is enough for us to declare its existence." 134 U. S., at 21.

As it was not the Eleventh Amendment by its terms which justified the result in *Hans,* it is not the Tenth Amendment by its terms that prohibits congressional action which sets a mandatory ceiling on the wages of all state employees. Both Amendments are simply examples of the understanding of those who drafted and ratified the Constitution that the States were sovereign in many respects, and that although their legislative authority could be superseded by Congress in many areas where Congress was competent to act, Congress was nonetheless not free to deal with a State as if it were just another individual or business enterprise subject to regulation.

I would hold that the activity of the State of Cali-

fornia in operating a railroad was so unlike the traditional governmental activities of a State that Congress could subject it to the Federal Safety Appliance Act. But the operation of schools, hospitals, and like facilities involved in *Maryland* v. *Wirtz* is an activity sufficiently closely allied with traditional state functions that the wages paid by the State to employees of such facilities should be beyond Congress' commerce authority. Such a distinction would undoubtedly present gray areas to be marked out on a case-by-case basis, as is true in applying any number of other constitutional principles. But today's case, in which across-the-board wage and salary ceilings are sustained with respect to virtually all state employees, is clearly on the forbidden side of that line.[2]

Congress may well in time of declared war have extraordinary authority to regulate activities in the national interest which could not be reached by the commerce power alone. Cf. *Yakus* v. *United States,* 321 U. S. 414

---

[2] As noted earlier in this dissent, the Government contends that *United States* v. *California,* 297 U.S. 175 (1936), makes it impossible to distinguish *Wirtz* on the basis that the employees in that case were performing primarily "proprietary" functions. *California* may certainly be read as rejecting not only this distinction, but also any other among activities conducted by a State, and as enunciating a rule that all state activities may be regulated by Congress. But such a sweeping doctrine is rejected even by the Court's present opinion, which if it means what it says must concede that a line will have to be drawn somewhere. It is conceivable that the traditional distinction between "governmental" and "proprietary" activities might in some form prove useful in such line drawing. The distinction suggested in *New York* v. *United States,* 326 U. S. 572 (1946), between activities traditionally undertaken by the State and other activities, might also be of service, although it too was specifically rejected in *California.* See 297 U. S., at 185. Here, of course, it is unnecessary to engage in the business of line drawing, since the regulation in question sweeps within its ambit virtually all state employees regardless of their tasks.

(1944). Congress may well be empowered under the legislative authority granted to it by the Fourteenth and Fifteenth Amendments to the Constitution to impose significant restrictions on what would otherwise be thought state prerogatives. *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966). But I do not believe that the Commerce Clause alone is sufficient to sustain the broad and sweeping federal regulation of the maximum salaries which Ohio may pay its employees, nor do I believe that the showing of national emergency made here is sufficient to make this case one in which congressional authority may be derived from sources other than the Commerce Clause.

The overruling of a case such as *Maryland* v. *Wirtz* quite obviously should not be lightly undertaken. But we have the authority of Mr. Chief Justice Taney, dissenting, in *The Passenger Cases,* 7 How. 283, 470 (1849); of Mr. Justice Brandeis, dissenting, in *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 405–411 (1932); and of MR. JUSTICE DOUGLAS, dissenting, in *New York* v. *United States,* 326 U. S., at 590–591, for the proposition that important decisions of constitutional law are not subject to the same command of *stare decisis* as are decisions of statutory questions. Surely there can be no more fundamental constitutional question than that of the intention of the Framers of the Constitution as to how authority should be allocated between the National and State Governments. I believe that re-examination of the issue decided in *Maryland* v. *Wirtz* would lead us to the conclusion that the judgment of the Temporary Emergency Court of Appeals in this case should be reversed.