Bill PRYOR, Attorney General for the State of Alabama, State of Alabama, Plaintiffs-Appellants,

v.

Janet RENO, Attorney General of the United States, United States of America, Defendants-Appellees.

No. 98-6261.

United States Court of Appeals,

Eleventh Circuit.

April 6, 1999.

Appeal from the United States District Court for the Middle District of Alabama. (No. CV-97-D-1396-N), Ira DeMent, Judge.

Before TJOFLAT, Circuit Judge, and GODBOLD and HILL, Senior Circuit Judges.

HILL, Senior Circuit Judge:

Plaintiffs, Bill Pryor, Attorney General for the State of Alabama, and the State of Alabama (referred to collectively as Alabama or "the State"), sought a declaratory judgment that the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721-25, is unconstitutional under both the Tenth and Eleventh Amendments to the United States Constitution, and an injunction prohibiting the defendants Janet Reno and the United States from enforcing the Act in whole or in part. The district court entered summary judgment for the United States, from which Alabama appeals.

I.

The Driver's Privacy and Protection Act of 1994 ("DPPA" or "the Act"), 18 U.S.C. §§ 2721, et seq., regulates the sale, dissemination and use by the State and private individuals of personal information[1]

---

[1]Section 2725(3) of the Act defines personal information as:

> information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the five-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accident, driving violations, and driver's status.

contained in the State's motor vehicle records.[2]  The Act prohibits "a State department of motor vehicles, and any officer, employee, or contractor, thereof, [from] knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record."  18 U.S.C. § 2721(a).  It makes it unlawful for a State department of motor vehicles [DMV], and any officer, employee, or contractor thereof, to knowingly disclose or otherwise make available personal DMV information for any purpose other than a "permissible use."  18 U.S.C. § 2721(b).  State departments of motor vehicles with a "policy or practice of substantial noncompliance" with the Act's provisions are subject to a civil penalty of up to $5,000 a day for each day of substantial noncompliance, to be imposed by the United States Attorney General.  18 U.S.C. § 2723(b).  Persons who knowingly violate the Act are subject to criminal fines.  18 U.S.C. § 2723(a).

Reversing course, the Act then allows disclosure of personal information in abundant circumstances.  18 U.S.C. § 2721(b).  For example, the Act *requires* that such information be disclosed for use in matters of motor vehicle or driver safety and theft, motor vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records from the original owner records of motor vehicle manufacturers to carry out the purposes of titles I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act, the Clean Air Act, and chapters 301, 305, and 321-331 of title 49.  18 U.S.C. § 2721(b) (citations omitted).  It further provides that personal information *may* be disclosed for use by any government agency in carrying out its functions, *id.* § 2721(b)(1);  in connection with car or driver safety, theft and other motor-vehicle related matters, *id.* § 2721(b)(2);  for use in the normal course of business by a legitimate business in certain instances, *id.* 2721(b)(3);  for use in connection with any civil, criminal, administrative or arbitral proceedings

---

[2]Section 2725(1) of the Act defines a "motor vehicle record" as:

> any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles.

in any Federal, State, or local court or agency or before any self-regulatory body, *id.* § 2721(b)(4); for use in research activities, and for use in producing statistical reports, so long as the personal information is not published, redisclosed, or used to contact individuals, *id.* § 2721(b)(5); for use by an insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claims investigation activities, anti-fraud activities, rating or underwriting, *id.* § 2721(b)(6); for use in providing notice to owners of towed or impounded vehicles, *id.* § 2721(b)(7); for use by a licensed private investigative agency or licensed security service for any purpose permitted under the Act, *id.* § 2721(b)(8); for use by an employer or its agent or insurer to obtain or verify required information relating to a holder of a commercial driver's license, *id.* § 27221(b)(9); and for use in connection with the operation of private toll transportation facilities, *id.* § 2721(b)(10).

The DPPA also regulates private individuals' sale or disclosure of the above information. The Act prohibits authorized recipients of personal DMV information from reselling or redisclosing personal information for a use which the State could not have disclosed it in the first place. 18 U.S.C. § 2721(c); 18 U.S.C. § 2722(a). The Act requires that individuals reselling or redisclosing personal information for a permissible use keep records for five years stating to whom they have resold or redisclosed the information and the purpose of any such release, and must make these records available to the state department of motor vehicles upon request. 18 U.S.C. § 2721(c). The Act also bars any person from knowingly obtaining personal DMV information for any unauthorized use, 18 U.S.C. § 2722(a), and from obtaining personal information "by false representation," 18 U.S.C. § 2722(b). Individuals who knowingly violate these provisions are subject to criminal fines, 18 U.S.C. § 2723(a), and private rights of action by the person to whom the personal information pertains. 18 U.S.C. § 2724.

In addition to the exceptions noted above, the Act allows States to establish waiver procedures to handle requests for disclosures that do not fall within these exceptions. 18 U.S.C. § 2721(d). The DPPA allows States to release personal information for any use not included in the Act's list of permissible uses, if

3

the motor vehicle department provides individuals an opportunity to prohibit such disclosure. 18 U.S.C. § 2721(b)(11). Also, departments of motor vehicles are permitted to release personal information for "bulk distribution" for surveys, marketing or solicitations if individuals have an opportunity to prohibit such disclosures. 18 U.S.C. § 2721(b)(12).

Alabama contends that Congress exceeded its authority under the Tenth and Eleventh Amendments when it enacted the DPPA. The State contends that the DPPA is an unconstitutional federal directive requiring it to administer a federal program in violation of the Tenth Amendment. The State further contends that the penalties imposed by the Act for noncompliance violate the Eleventh Amendment. The United States counters that the Act is a constitutional exercise of Congress' power under the Commerce Clause of the United States Constitution to regulate and control the dissemination of personal information in state DMV records in order to protect the privacy and safety of individuals. On cross-motions for summary judgment,[3] the district court held that the Act is a valid exercise of Congress' authority to regulate interstate commerce, and that it violates neither the Tenth nor the Eleventh Amendment. Alabama appeals from the entry of this judgment.

## II.

Alabama asserts that the DPPA violates the Tenth Amendment in two ways. First, Alabama contends that the Commerce Clause does not authorize Congress to invade the Tenth Amendment by regulating the States' dissemination of motor vehicle information. Second, Alabama contends that the Tenth Amendment prohibits Congress from requiring it to administer a federal program.

A.    *Congress' Authority to Enact the DPPA*

Alabama argues that Congress exceeded its authority in regulating the States' release of motor vehicle information because the dissemination of this information is neither commerce, nor an activity substantially

---

[3]The United States' motion was for dismissal which the district court construed as a motion for summary judgment pursuant to Rule 12(b), Fed.R.Civ.P.

affecting commerce. Although it is abundantly clear that trafficking in data bases is an activity that substantially affects interstate commerce these days, we are, nonetheless, sympathetic to this argument. Congress drew its authority to regulate this activity from its nexus to interstate commerce, and then proceeded to exempt from the reach of the Act virtually all its interstate connections.

It is clear that Congress sought by this Act to protect the public from "stalkers" who might use motor vehicle information to locate their victims.[4] In trying to protect legitimate governmental and business uses of such information, however, Congress riddled the Act with more holes than Swiss cheese. Through these holes escaped most of the interstate commerce activity covered by the Act. Thus, Congress claims its authority to regulate the States' dissemination of personal DMV information lies in its power to regulate the commercial aspect of this information which it then proceeded to exclude from the Act.

We shall not resolve this troublesome issue, however, because we are persuaded that even if there is a sufficient connection between this legislation and interstate commerce to authorize Congress to enact the DPPA, the Act violates the Tenth Amendment.

B.      *The DPPA and the Tenth Amendment*

The Supreme Court has recently made clear that the federal government may not command the States to administer or enforce a federal regulatory program. *Printz v. United States,* 521 U.S. 98, ----, 117 S.Ct. 2365, 2384, 138 L.Ed.2d 914 (1997); *New York v. United States,* 505 U.S. 144, 176-77, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). In *New York,* the Supreme Court addressed the constitutionality of the Low-Level Radioactive Waste Policy Act which required States to choose between accepting ownership of radioactive waste generated within their borders and regulating this waste according to instructions from Congress. 505

---

[4]During floor debate on the Senate version of the Act, Senators invoked the example of Rebecca Shaeffer, an actress from California, who was murdered by an obsessed fan who obtained her address from the department of motor vehicles through a private investigator. *See* 139 Cong.Rec. S15,766, Comments of Senator Harkin. *See also* (Feb. 4, 1994) (statement of Rep. Moran): 139 Cong.Rec. S15,762 (Nov. 16, 1993) (statement of Sen. Boxer); 139 Cong.Rec. S15,765 (Nov. 16, 1993) (statement of Sen. Robb); 139 Cong.Rec. S15,765 (statement of Sen. Biden).

U.S. at 152, 112 S.Ct. 2408. The Court found that this provision "commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," in violation of the Tenth Amendment. *Id.* at 176, 112 S.Ct. 2408. In *Printz,* the Court extended the holding of *New York* to recognize that the Tenth Amendment protects state officers, as well as States, from federal commandeering. In *Printz,* the Court held unconstitutional provisions of the Brady Handgun Violence Prevention Act which imposed interim requirements on State chief law enforcement officers ("CLEOs") to conduct background checks on prospective handgun purchasers and to perform related tasks. 521 U.S. at ----, 117 S.Ct. at 2368. The Act required CLEOs to:

> make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a firearm by a particular purchaser] would be in violation of the law, including research in whatever state and local record keeping systems are available.

*Id.* at ----, 117 S.Ct. at 2369 (quoting 18 U.S.C. § 922(s)(2)). The Court characterized this provision as one directing or forcing state law enforcement officers to participate in the administration of a federally enacted regulatory scheme. *Id.* at ----, ----, 117 S.Ct. at 2369, 2376. The Court held the requirement violated the Tenth Amendment because:

> [t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.

*Id.* at ----, 117 S.Ct. at 2384.

Although *New York* and *Printz* make clear that federal law may not direct state officials to administer or enforce a federal regulatory scheme, they are less helpful in identifying the attributes of such a law. We recognize that the DPPA does not compel Alabama to enact legislation as in *New York;* nor does it conscript state officers to help the federal government search for potential violations of federal law as in *Printz.*

Nevertheless, the DPPA does establish a detailed set of rules under which Alabama's disclosure or refusal to disclose to third parties the personal information in its motor vehicle records shall be done as the

6

federal establishment wishes it to be done. The Act *requires* that department of motor vehicle officers disclose personal information contained in its motor vehicle records for use in connection with matters of motor vehicle or driver safety and theft and to carry out various federal statutes.[5] It further provides that personal information *may* be disclosed in fourteen other circumstances. It seeks to regulate the circumstances under which private individuals may obtain this information and to prevent the disclosure at all in certain instances. No one disputes that Congress, through the DPPA, has enacted a federal regulatory program to control the dissemination and cloaking of the States' motor vehicle information.

Furthermore, the Act is neither self-administering nor self-enforcing. State officers are *directed* to administer and enforce these rules. They must insure that protected information is disclosed only for the designated purposes specified by the federal rules. In complying with the Act, state officers must review requests for information to determine whether the request is for a permissible use. The Act contains no explicit instructions regarding the extent to which the state officer must investigate and confirm the accuracy of the claims made by individuals requesting the information. In reviewing requests and interpreting the rules, state officers will be acting as federal agents making federal policy. *See Printz,* 521 U.S. at ---- - ----, 117 S.Ct. at 2380-81.

Thus, we conclude the DPPA is a federal regulatory program which Congress has directed state officers to administer. Congress may not enlist state officers in this way. *Printz,* 521 U.S. at ----, 117 S.Ct. at 2380. As the Court stated in *New York:*

> States are not mere political subdivisions of the United States. State governments are neither regional offices nor administrative agencies of the Federal Government. The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart.

505 U.S. at 188, 112 S.Ct. 2408.

---

[5]This requirement nullifies the United States' argument that the Act does not command the States to do anything because the States may simply opt out of this legislation by deciding to close their DMV records completely.

The United States argues that it is permissible for Congress to command state officers to assist in the implementation of federal law so long as Congress itself devises a clear legislative program that regulates the States directly rather than requiring them to regulate third parties. The DPPA, it is said, is constitutional because it directly regulates state activities and neither directs the States or their officials to regulate their citizens, nor to construct any regulatory regime.

We disagree. To be sure, Congress may require the States to comply with federal regulation of an activity affecting interstate commerce when the States choose to engage in that activity.[6] Thus, the States as employers must comply with the federal minimum wage law. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). *See also South Carolina v. Baker,* 485 U.S. 505, 511-15, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988) (States may be required to issue bonds in registered form as are private corporations); *United Transp. Union v. Long Island R. Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (labor laws apply to state-owned railroads); *Fry v. United States,* 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975) (States are bound by generally applicable wage and price controls).

But all of these cases are examples of when a particularly strong federal interest permits Congress to bring state governments within the orbit of generally applicable federal regulation. *Garcia,* 469 U.S. at 554, 105 S.Ct. 1005 ("San Antonio faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet"). In *Printz* and *New York,* the Supreme Court distinguished such laws of general applicability from laws targeted exclusively at States. 521 U.S. at ----, 117 S.Ct. at 2383; 505 U.S. at 160, 112 S.Ct. 2408. Although the Tenth Amendment does not automatically permit the former and proscribe the latter, in the cases cited above the issue was whether the incidental application to the States of federal laws of general applicability

---

[6]In fact, Congress may totally occupy a field of regulation of interstate commerce but permit continued state regulation of the activity so long as a State meets certain preconditions. The DPPA does not, however, preempt the field of licensing drivers. Nor does it impose preconditions to the States' continued regulation of a totally preempted field. It seeks only to direct the States in that regulation.

8

excessively interfered with the functioning of state governments. The federal laws at issue were upheld because the federal interest was strong enough to permit Congress to bring state governments within the orbit of generally applicable federal regulation.

The Court has made clear, however, that where, as here, the "whole object of the law [is] to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty, such a 'balancing' analysis is inappropriate." 521 U.S. at ----, 117 S.Ct. at 2383. *See also New York,* 505 U.S. at 160, 112 S.Ct. 2408 (radioactive waste statute unconstitutional because the "[take title] provision is inconsistent with the federal structure of our Government established by the Constitution"). Instead of bringing the States within the scope of an otherwise generally applicable law, Congress passed the DPPA specifically to regulate the States' control of the States' own property—the motor vehicle records. "It is the very principle of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect." *Printz,* 521 U.S. at ----, 117 S.Ct. at 2383.[7]

It is not state power that the principle of state sovereignty protects. When States are forced to administer federal programs, a fundamental attribute of State sovereignty is threatened: democratic accountability. It is this basic principle upon which the Supreme Court rested its holdings in *New York* and *Printz:*

> By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for "solving" problems without having to ask their constituents to pay for the solutions with higher federal taxes. And even when the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of

---

[7]The United States suggests that the DPPA is generally applicable when considered in the context of other federal laws which regulate the dissemination of personal information, such as the Video Privacy Protection Act, 18 U.S.C. § 2710 (restricting disclosure of personal information contained in video rental records) and the Cable Communications Policy Act, 47 U.S.C. § 551 (restricting disclosure of personal information about cable subscribers). Even if a statute could be considered generally applicable because it is part of some sort of scheme of regulation, Congress has thus far regulated the disclosure of personal information by holders of databases only in a piecemeal fashion. There is no generally applicable Congressional regulation of the disclosure of such information even if all such laws are considered part of such a scheme. Thus, there is no generally applicable Congressional regulation of this activity of which the DPPA is a part.

9

taking the blame for its burdensomeness and for its defects.... Under the present law, for example, it will be the CLEO and not some federal official who stands between the gun purchaser and immediate possession of his gun. And it will likely be the CLEO, not some federal official, who will be blamed for any error (even one in the designated federal database) that causes a purchaser to be mistakenly rejected.

521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914. The Court also observed in *New York:*

But where the Federal Government directs the States to regulate, it may be state officials who will be the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation.

505 U.S. at 169, 112 S.Ct. 2408 (citations omitted). Thus, when Congress requires the States to administer a federal program, democratic accountability is diminished and for this reason the Tenth Amendment is offended.

This Act cannot be saved by the argument that it simply regulates a realm of national economic activity—the buying and selling of personal information—whether or not the economic actors happen to be State or citizens.[8] The DPPA is not a law of general applicability.[9] Only States collect driver's license and motor vehicle information. This is an exercise of sovereignty. *See Peel v. Florida Dept. of Transp.,* 600 F.2d 1070, 1083 (5th Cir.1979) ("Overseeing the transportation system of the state has traditionally been one of

---

[8]A similar argument was made in *Printz* that the burden on officers of the state would be permissible if a similar burden were also imposed on private parties with access to relevant data. The Court rejected this argument by noting:

The Brady Act does not merely require CLEOs to report information in their private possession. It requires them to provide information that belongs to the State and is available to them only in their official capacity; and to conduct investigations in their official capacity, by examining databases and records that only state officials have access to. In other words, the suggestion that extension of this statute to private citizens would eliminate the constitutional problem posits the impossible.

521 U.S. at ----, 117 S.Ct. at 2383.

[9]Although the Act restricts the way in which private parties who obtain personal information from a motor vehicle department may resell or redisclose such information, the Act's applicability to private parties is incidental to its foremost purpose: regulating the way in which state disseminate information collected by their motor vehicle divisions.

10

the functions of state government, and thus appears to be within the activities protected by the tenth amendment"); *United States v. Best,* 573 F.2d 1095, 1103 (9th Cir.1978) ("[T]here is little question that the licensing of drivers constitutes 'an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens' ").

Thus, we conclude that the DPPA is a federal program which Congress has commanded the States to administer. As such, it offends the Tenth Amendment.[10] *Accord Condon v. Reno,* 155 F.3d 453 (4th Cir.1998). *But see Travis v. Reno,* 163 F.3d 1000 (7th Cir.1998); *Oklahoma v. United States,* 161 F.3d 1266 (10th Cir.1998).

### III.

The judgment of the district court is hereby REVERSED, and the case is REMANDED. The district court shall grant Alabama's motion for an injunction against the enforcement of the DPPA.

---

[10]We find no merit in the United States' contention that the Act is a valid exercise of Congress' power to enforce the Fourteenth Amendment. U.S. Const. amend. XIV, §§ 1, 5. Whether Congress properly exercised its power under Section 5 in enacting the DPPA depends upon whether the Act enforces some right guaranteed by the Fourteenth Amendment. According to the United States, we have held that there is a "right to confidentiality" in the sort of personal information protected by the DPPA. We disagree. For example, in one of the cases cited by the United States, *James v. City of Douglas,* 941 F.2d 1539, 1544 (11th Cir.1991), we acknowledged a constitutional right to privacy only for *intimate personal information given to a state official in confidence.* Because information contained in motor vehicle records is not this sort of information, an individual does not have a reasonable expectation that the information is confidential. Thus, there is no constitutional right to privacy in motor vehicle record information which the DPPA enforces.

We do not reach the Eleventh Amendment issue involving the constitutionality of the fines provided for by the DPPA because we hold the Act unconstitutional under the Tenth Amendment.