

# THE ATTORNEY GENERAL
## OF TEXAS

August 21, 1987

**JIM MATTOX**
**ATTORNEY GENERAL**

Honorable Grant Jones
Chairman
Finance Committee
Texas State Senate
P.O. Box 12068
Austin, Texas  78711

Opinion No. JM-772

Re:  Authority of the governor to effect the disbursement of petroleum overcharge funds

Honorable Clint Hackney
Chairman
Energy Committee
Texas House of Representatives
P. O. Box 2910
Austin, Texas  78769

Gentlemen:

You ask the following question:

> Does the Governor have authority to effect the disbursement of petroleum overcharge funds currently held by this State absent legislative appropriation of such funds by the Legislature? In other words, absent legislative appropriation to himself or affected agencies, does the Governor have the authority under federal or state law to direct the Comptroller to transfer the State's share of petroleum overcharge funds, currently held in the State Treasury, to the accounts of specified state agencies or commissions and in so doing, permit such agencies or commissions to expend such funds pursuant to the Governor's directives?

You explain that your question arose because of money that Texas received as a result of two lawsuits: _U.S. v. Exxon_, 561 F. Supp. 816 (D.D.C. 1983), _aff'd_, 773 F.2d 1240 (Temp. Emer. Ct. App. 1985), _cert. denied_, 106 S.Ct. 892 (1986) (hereinafter _Exxon_), and _In re: The Department of Energy Stripper Well Exemption Litigation_, 578 F. Supp. 586 (D. Kan. 1983) _settled_, Final Settlement Agreement of M. D. L. No. 378 (D. Kan. 1986) (hereinafter _Stripper Well_). Both of those lawsuits involved distribution of escrow accounts containing money

collected from oil companies because of violations of the Emergency Petroleum Allocation Act, 15 U.S.C. §7193. Because of the difficulty of identifying who actually paid the overcharges, the court in Exxon and the settlement agreement in Stripper Well fashioned remedies intended to approximate restitution. The bulk of the money involved in Exxon and Stripper Well was awarded to the states to be used for energy conservation programs. Under the terms of both the court order in Exxon and the settlement agreement in Stripper Well the states have discretion to determine how the money will be allocated among various conservation programs. You ask several questions about the proper in-state distribution of that money. The disposition of the Exxon money raises more complex issues than the disposition of the Stripper Well money, and we will address those issues first.

In Exxon the district judge ordered that the escrow funds be spent by the states in accordance with the terms of Section 155 of Public Law No. 97-377, 96 Stat. 1830, 1919-20 (1982) (hereinafter "section 155"). 561 F. Supp. at 856. Section 155, which Congress enacted to distribute $200 million in petroleum overcharge funds that had been in an escrow account for several years, provides:

> (a) It is the purpose of this section to provide the Secretary of Energy the exclusive authority for the disbursement of the designated petroleum violation escrow funds for limited restitutional purposes (1) which are reasonably expected to benefit the class of persons injured by such violations, and (2) which, based on information previously provided to Congress by the Secretary of Energy, are likely not to be, through procedures established by regulation, otherwise refunded to injured persons because the purchasers of the refined petroleum products cannot be reasonably identified or paid or because the amount of each purchaser's overcharge is too small to be capable of reasonable determination.

---

1. Since we drafted this opinion, the legislature has enacted and the governor has signed a bill that gives the governor's office certain authority in regard to distribution of petroleum overcharge funds. S.B. 33, 70th Leg., 2d C.S. (1987). The legislature also appropriated oil overcharge funds for certain projects. S.B. 1, 70th Leg., 2d C.S., art. V, §81, at V-82 (1987). The appropriation and delegation of authority to the governor's office are in accord with the proper procedures under Texas law for allocating and appropriating the funds in question.

(b) As soon as practicable, the Secretary of Energy shall disburse designated petroleum violation escrow funds to the Governors of the States in accordance with the formula set forth in subsection (d).

(c) Amounts disbursed to the Governor of any state shall be used by the Governor as if such funds were received under one or more energy conservation programs. The Governor shall identify to the Secretary within one year after the time of disbursement the energy conservation program or programs to which the funds are or will be applied. Funds disbursed under this section shall be used to supplement, and not supplant, funds otherwise available for such programs under Federal or State law.

(d) The disbursement by the Secretary of Energy to each State shall be based on the ratio, calculated by the Secretary, which—

(1) the volume of refined petroleum products consumed within that State during the period beginning September 1, 1973, and ending January 28, 1981, bears to

(2) the volume of refined petroleum products consumed within all States during such period.

Calculations made by the Secretary of Energy under this subsection shall be based upon estimates by the Secretary from reasonably available information.

(e) For purposes of this section—

(1) The term 'designated petroleum violation escrow funds' means amounts (not in excess of $200,000,000) which are derived from settlements from alleged petroleum pricing and allocation violations generally resulting in overcharges to purchasers of refined petroleum products and held in trust accounts administered by the Department of Energy on December 17, 1982, and which—

(A) are not likely to be required for

satisfying claims of potential claimants identified in the proceedings of the Office of Hearings and Appeals initiated prior to December 17, 1982, or identified in judicial proceedings initiated prior to such date; and

(B) the use of under this section would be consistent with the remedial order or consent order covering such funds.

(2) The term 'energy conservation programs' means--

(A) the program under Part A of the Energy Conservation and Existing Buildings Act of 1976 (42 U.S.C. 6861 and following);

(B) the programs under part D of title III of the Energy Policy and Conservation Act (relating to primary and supplemental State energy conservation programs; 42 U.S.C. 6321 and following);

(C) the program under part G of title III of Energy Policy and Conservation Act (relating to energy conservation for schools and hospitals; 42 U.S.C. 6371 and following);

(D) program under the National Energy Extension Service Act (42 U.S.C. 7001 and following); and

(E) the program under the Low-Income Home Energy Assistance Act of 1981 (42 U.S.C. 8621 and following).

(3) The term 'State' means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(4) The term 'Governor,' when used with respect to any States, means the Governor or the chief executive officer of that State.

> (5) The term 'refined petroleum product' means gasoline, kerosene, distillates, (including Number 2 fuel oil), LPG (other than ethane), refined lubricating oils, diesel fuel, and residual fuel oil, but does not include refinery feedstocks.

> (f) No funds disbursed under this section may be used for any administrative expenses of the Department of Energy or of any State, whether incurred in connection with any energy conservation program or otherwise. (Emphasis added).

In short, section 155 orders the Secretary of Energy to disburse the money to the states, and it directs the states to allocate the money among the five energy conservation programs listed in section 155. Because section 155 provides that the secretary shall disburse the money to "the Governor" and that the money "shall be used by the Governor," questions have arisen about the role Congress intended governors to play in allocating section 155 money and, thus, Exxon money. Two different interpretations of the references to governors in section 155 have been suggested.

One suggested interpretation is that Congress simply intended to disburse the section 155 money to the states and to allow the states to use their traditional decision-making processes to determine how the money would be distributed among the five programs.[2] The other suggested interpretation of section 155 is that the references to the governor were intended to give a governor authority to determine how the money would be allocated among the five conservation programs listed in section 155, regardless of the role the governor plays in a state's decision-making process under state law. For Texas there is

---

2. You explain that in 1983 when Texas received money under section 155, the governor did not exercise any authority in determining how the section 155 money would be spent. Rather, you explain, the Texas Energy and Natural Resources Advisory Counsel (TENRAC) recommended to the legislature how the money should be distributed among the conservation programs listed in section 155. See generally Acts 1979, 66th Leg., ch. 666, at 1545 (establishing TENRAC and authorizing TENRAC to recommend to the legislature and governor policies and actions affecting energy and natural resources). You state that the legislature appropriated the money in accordance with TENRAC's recommendation. See Acts 1983, 68th Leg., ch. 1095, Art. V, §81, at 5729, 6233.

an important difference between those two interpretations because under Texas law the legislature, not the governor, has authority to allocate and appropriate state funds. See Attorney General Opinion C-530 (1965)(federal funds deposited in the state treasury become state funds). Before we address the question of the proper interpretation of section 155, we will explain the role of the legislature under state law in allocating and appropriating state funds, including funds received from the federal government.

As a general rule, money received by the state is to be deposited in the state treasury. V.T.C.S. art. 4393-1, §4.004(a). Although there are several exceptions to that rule, funds received from the federal government are generally not within any of those exceptions.[3]

---

3. Article 4393-1, section 4.003(b), sets out four exceptions to the general rule that funds received by the state are to be deposited in the state treasury. One of those exceptions is for "funds held in trust or escrow for the benefit of a person or entity other than a state agency." V.T.C.S. art. 4393-1, §4.003(b)(2). See also Friedman v. American Surety Co. of New York, 151 S.W.2d 570, 580 (Tex. 1941). That exception is sometimes referred to as the "trust fund" exception. In a different context, this office has referred to federal funds as "trust funds." Attorney General Opinion M-468 (1969) stated that federal funds to be expended for a specific purpose are held by the state in trust for the benefit of the programs being administered and that interest earned on federal funds remains part of the special fund or trust fund. Although most federal funds are "trust funds" inasmuch as they may not be diverted, we do not think that federal funds are, as a rule, within the "trust funds" exception to article 4393-1. That exception is for money held in trust "for the benefit of a person or entity other than a state agency." We do not think that the the funds in question, or federal funds generally, are held "for the benefit of a person or entity other than a state agency" for purposes of that exception. The funds in question were awarded to the state to be used for conservation programs. Some state agency will administer the programs for which the funds are used. Although those programs, like all activities of state government, are intended to ultimately benefit individuals rather than agencies, the individuals who will ultimately benefit are as yet unidentified. It is the responsibility of the state to identify precisely how the funds will be used and which individuals will benefit. In those circumstances, we think that funds that are intended for a program to be administered by a state agency are funds held for the benefit of state agency, for purposes of the trust fund exception set out in article 4393-1, section 4.003(b)(2). See Attorney General Opinion

(Footnote Continued)

See Attorney General Opinion H-120 (1973); see also General Appropriations Act, Acts 1986, 69th Leg., 3d C.S., ch. 13, art. V, §20 at 594 (appropriating federal funds out of the state treasury). You tell us that the Exxon and Stripper Well money received pursuant to the court order in Exxon was in fact deposited in the treasury.

Under the Texas Constitution no money can be withdrawn from the state treasury except pursuant to an appropriation made by the legislature. Tex. Const. art. VIII, §6; Bullock v. Calvert, 480 S.W.2d 367, 370 (Tex. 1972). This constitutional provision applies to all funds in the treasury, including funds dedicated to a special purpose. Attorney General Opinion V-412 (1947).

Most federal funds, like the Stripper Well and Exxon funds, are special funds and may not be diverted from the purpose for which they were granted to the state. Attorney General Opinion M-468 (1969). Because a state's discretion in the use of federal funds is often severely restricted, the legislature's appropriation of federal funds is usually largely pro forma. For example, the 69th Legislature appropriated federal funds received by the state in the 1986-87 biennium to the agencies that are to administer those funds:

> All funds received from the United States government by state agencies and institutions named in this Act are hereby appropriated to such agencies for the purposes for which the federal grant, allocation, aid, payment or reimbursement was made subject to the following:
>
> (1) Federal funds including unexpended balances shall be deposited to and expended from the specific program identified under each agency's

---

(Footnote Continued)
M-468 (1969) (federal funds for a specific program are held in trust for the benefit of the program). See also Attorney General Opinion JM-479 (1986) ("Service Charge Trust Fund" held by the Texas Surplus Property Agency is a trust for the benefit of a state agency and not within the "trust fund" exception to the State Funds Reform Act). Cf. Attorney General Opinion MW-363 (1981) (fund for benefit of prisoners is to be held outside state treasury). Thus, we believe that the money in question was properly placed in the state treasury. We also note that the legislature has routinely appropriated federal funds out of the treasury. See General Appropriations Act, Acts 1986, 69th Leg., 3d C.S., ch. 13, art. V, §20 at 594. See also Attorney General Opinion C-551 (1965) (discussing the appropriation of federal "trust" funds).

appropriation bill pattern.

> No federal funds may be expended for programs
> or activities other than those which have been
> reviewed by the Sixty-ninth Legislature and
> authorized by specific language in this Act or
> encompassed by an agency's program structure as
> established by this Act.

General Appropriations Act, Acts 1986, 69th Leg., 3d C.S., ch. 13, art. V, §20 at 594 (emphasis added). See also S.B. 1, 70th Leg., 2d C.S., art. V, §21, at V-60 (1987); Acts 1983, 68th Leg., ch. 1095, art. V, §20, at 6216; Acts 1981, 67th Leg., ch. 875, art. V, §18, at 3808. The first paragraph of the provision above would appear to appropriate section 155 money—and thus Exxon settlement money—to the governor's office since the governor's office is the institution that is to receive section 155 money. The emphasized paragraph, however, negates any such appropriation by prohibiting the expenditure of federal funds for programs other than those reviewed by the 69th Legislature and encompassed by an agency's program structure. The program structure for the governor's office under the 1986-87 appropriations act does not include the programs listed in section 155. Further, no general state statute currently in effect devolves upon the governor's office the authority to administer a program listed in section 155 such that the general appropriation of funds for 1986-87 could encompass these disbursements. The legislation discussed in footnote 1 does, of course, give the governor's office authority to administer section 155 programs for the 1988-89 biennium.

A corollary of the legislature's exclusive control over the appropriation of state funds is its exclusive control over how state funds are to be spent. Attorney General Opinion JM-256 (1984). Under state law the governor has no power to make determinations about how state money is to be distributed unless that power is expressly given to him by constitutional or statutory grant. Attorney General Opinions H-120 (1973); M-910 (1971). See generally Tex. Const. art. IV, §10. Thus, under Texas law the governor would have authority to determine how the Exxon money is to be allocated only if the legislature delegated that authority to him.

With those aspects of Texas law in mind, we turn to the interpretation of section 155. If, as it has been suggested, section 155 was intended to give governors the authority to allocate and disburse the funds regardless of state law, a troublesome question presents itself as to whether Texas may accept the funds even though acceptance of the funds under the terms of the grant would require the governor to take action that is beyond his powers under state law. See Madden, The Constitutional and Legal Foundations of Federal Grants, in Federal Grant Law (M. Mason ed. 1982)(pointing out that

courts have generally considered federal grants to be inducements that states are free to refuse). See also Brown, Federal Funds and National Supremacy:  The Role of State Legislatures in Federal Grant Programs, 28 Am. U. L. Rev. 279 (1979).

Several state courts have considered whether federal grant programs are intended to increase the power of governors to set priorities and allocate resources.  In Opinion of the Justices, 381 A.2d 1204 (N.H. 1978), the court considered whether the state legislature could designate the state health planning agency for purposes of administering a federal grant program.  The federal legislation stated that the agency should be "selected by the Governor."  The New Hampshire court wrote:

> If this federal act precludes the legislature from creating the State health planning agency, the words, 'selected by the Governor,' must be read as, 'selected by the Governor notwithstanding State constitutional restrictions on his authority and to the exclusion of any legislative involvement in the process.'  This, of course, presumes that the federal authorities, in drafting the National Health Planning and Resources Development Act of 1974, intended that the Governor of a State would select an agency for designation on his own without any legislative involvement in the process.  The legislative history does not justify such a conclusion.  See [1974] U.S.Code Cong. & Admin. News, pp. 7891-92.

> The statutory scheme is clear -- the State must work out the details of its commitment to health planning, presumably in compliance with the State constitution, and then enter into agreement with the federal authorities.  The thrust of both the Federal Act and its predecessors is that the State should construct its own administrative plan and designate its planning agency.  Then the Governor, acting as the agent of the State, will apply for designation of that agency.  The federal act does not confer on the Governor the right to disregard the State's constitutional processes in selecting the agency for the administration of the State health plan.

. . . .

> If any doubt exists, the federal law should not
> be interpreted to infringe upon those powers of
> the States that are essential to their 'ability to
> function effectively in a federal system.' Fry v.
> United States, 421 U.S. 542, 547 n.7, 95 S.Ct.
> 1792, 1796, 44 L.Ed.2d 363 (1975); accord National
> League of Cities v. Usery, 426 U.S. 852, 96 S.Ct.
> 2465. As stated by the Court some years earlier:
>
>> In a dual system of government in which,
>> under the Constitution, the states are
>> sovereign . . . an unexpressed purpose to
>> nullify a state's control over its officers
>> and agents is not lightly to be attributed
>> to Congress.
>
> Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307,
> 313, 87 L.Ed. 315 (1943). Hence, we find no clear
> manifestation of congressional intent to override
> the constitutional powers of our legislature to
> determine which agency will be designated as the
> health planning office for New Hampshire. Shapp
> v. Sloan, 27 Pa. Cmwlth. at 326, 367 A.2d at 799.

381 A.2d at 1210-11. Because of the New Hampshire court's resolution
of that issue, the court did not have to reach another question
raised: whether an attempt by Congress to require the governor to
exercise certain powers would preclude New Hampshire's acceptance of
the federal funds in question. 381 A.2d at 1206.

In Shapp v. Sloan, 391 A.2d 595 (Pa. 1978), appeal dism'd sub
nom. Thornburgh v. Casey, 440 U.S. 942 (1979), the Supreme Court of
Pennsylvania upheld the constitutionality of a state statute that
required that all federal funds received by the state be deposited in
the state's general fund and that also prohibited the expenditure of
federal funds except pursuant to a specific appropriation by the
state's general assembly. In response to the argument that federal
funds are intended to be used by the state executive branch without
legislative approval, the court wrote:

> Nothing in the federal legislation pursuant to
> which these funds are granted suggests that the
> same principles by which programs wholly state
> funded are operated are inapplicable to programs
> for which federal funds are supplied. That the
> executive agency or official must use federal
> monies within the program for which they were
> intended, and must provide an accounting to show
> that they were so used, does not lead to the

> conclusion that the funds are under that
> official's control and outside the control of the
> legislature.

Shapp v. Sloan, 391 A.2d at 604. See also Anderson v. Regan, 425 N.
E.2d 792, 793-94 (N.Y. 1981) (under New York constitution federal
funds are subject to appropriations process).

A number of state courts have held that federal funds are outside
their states' legislative appropriation processes. State ex rel. Sego
v. Kirkpatrick, 524 P.2d 975, 986 (N.M. 1974) (under New Mexico law
state legislature has no power to appropriate federal funds); MacManus
v. Love, 499 P.2d 609, 610-11 (Colo. 1972) (under Colorado law federal
funds are not subject to the power of the General Assembly to make
appropriations). These decisions, however, have turned on
requirements of state law, not requirements of federal law. In a
recent affirmation of the position that federal funds are not subject
to the Colorado legislative appropriation process, the Colorado
Supreme Court emphasized that its decision was based on state law and
was not required by federal law:

> As long as the funds are not diverted from
> their intended purposes and the terms and
> conditions prescribed by the congress are not
> violated, there is no inconsistency between the
> provisions of the federal programs and state
> legislative administration of the funds. The
> federal government has expressly given the states
> a wide discretion in dealing with these funds.
> That discretion is most logically exercised by the
> branch of state government which is constitution-
> ally empowered to exercise control over all
> expenditures.
>
>     . . . .
>
> State courts have not felt constrained by
> federal law to reach conclusions that uniformly
> grant state legislatures the power of appropria-
> tion over state funds. Congress has left the
> issue of state legislative appropriation of
> federal block grants for each state to determine.

Colorado General Assembly v. Lamm, No. 85SA70, slip op. at 13 (Colo.
June 1, 1987).

At least one law review article has considered whether federal
grant programs can enhance the powers of governors. Brown, Federal
Funds and National Supremacy: The Role of State Legislatures in

Federal Grant Programs, 28 Am. U. L. Rev. 279 (1979).  Without conclusively determining that a federal grant program can increase the powers of a governor, the author concluded that Opinion of the Justices, 381 A.2d 1204 (N.H. 1978), applied the proper test in requiring a "clear manifestation of congressional intent" before it would conclude that Congress intended to invade the traditional powers of state legislatures.  See also United States v. Bass, 404 U.S. 336, 349-50 (1971) (where statute is ambiguous, court assumes congressional intent not to diminish state power); L. Tribe, American Constitutional Law, 243-44, 304 (1978)(a rule like the clear statement requirement is essential in determining whether Congress intended to exercise its commerce power in full because "Congress must be prevented from resorting to ambiguity as a cloak for its failure to accommodate the competing interests bearing on the federal-state balance"); Bulletin 76-4 of the Advisory Commission on Intergovernmental Relations (Nov. 1976)(recommending that state legislatures include all federal aid in appropriations bills).  Therefore, we conclude that the proper approach to use in interpreting section 155 is to determine whether there is a clear manifestation of congressional intent to alter states' traditional decision-making processes.  We now address that issue.

Section 155 states that petroleum violation escrow funds are to be disbursed to the governor of a state and that the governor is to use those funds as if they were received under one or more of the five energy conservation programs.  It also states that the governor shall identify to the Secretary of Energy the program or programs to which the money will be applied.  On its face, then, section 155 appears to give the governor authority to determine how the money is to be allocated among the five energy conservation programs.  In Opinion of the Justices and Shapp, however, such references to "governors" were found to be inadequate to show a clear indication that Congress intended to upset states' traditional decision-making processes.

The Congressional Record shows that the purpose of section 155 was to distribute ·$200 million in escrow accounts that had been collected since 1978 for oil overcharges to consumers.  149 Cong. Rec. S15,115-16 (1982) (daily ed. Dec. 16, 1982) (statement of Senator Warner).  The issue that most concerned the House and the Senate was how the money could be most fairly distributed among the states.  See, e.g., 149 Cong. Rec. at S15,131 (statements of Senator Ford).  Neither the House nor the Senate demonstrated any concern about whether or not state legislatures played a role in allocating the funds once they had been distributed to the states.  In the discussions of section 155 in both the House and the Senate, some members talked about the bill in terms of distribution of the money to the states for allocation by the states.  Others talked in terms of distribution to the governors for allocation by the governors.  There was no discussion, however, of prohibiting legislatures from playing their traditional roles in

decision-making.  Because nothing in the statute and nothing in the legislative history of the statute indicates that Congress intended to increase the powers of governors in those states in which the governor's powers were inadequate to allocate public money or that Congress intended to limit the role of legislatures, we conclude that Congress did not intend to confer on a governor the right to disregard his state's constitutional process for appropriating and allocating funds.  Opinion of the Justices, 381 A.2d at 1210.  Therefore, in Texas the legislature must determine or delegate the authority to determine how the Exxon money should be allocated among the five conservation programs listed in section 155, and the legislature must appropriate the Exxon money in order for it to be withdrawn from the treasury.  And, as indicated in footnote 1, the legislature has now done so.  Because we interpret section 155 as not disrupting the traditional state decision-making process, we need not address the difficult issue of whether Texas may accept money under the condition that the governor exercise powers he does not possess under state law.

The same principles of Texas law governing allocation and appropriation of state funds are applicable to the money Texas receives pursuant to the Stripper Well settlement.  The settlement requires that the money must be spent on energy programs.  The settlement conditions applicable to the states include the following:

> f.  State Use of Funds.  Funds available for distribution to the States shall be allocated among them on the basis of historical consumption patterns of refined petroleum products in the United States during the Settlement Period in the proportions as set forth in Exhibit H hereto, provided that no funds shall be distributed to a State until such State has submitted the signed Letters of Assurance required by this Paragraph.  The payment mechanism set forth herein shall be the exclusive means of achieving distribution of the funds.  The Attorney General of each State shall deliver to the Governor of such State, for the Governor's execution, duplicate originals of a Letter of Assurance in the form set forth in Exhibit I to this Agreement.  Within 20 days following the date of the Approval Order, the Attorney General shall deliver to the Clerk of the Court and to the Administrator of ERA, DOE, such Letters of Assurance signed by the Governor of such State.  At the same time, the Attorney General of each State shall designate in writing to the disbursing official of the M.D.L. 378 Escrow whether disbursement shall be by check or by wire transfer, and if by wire transfer, shall

provide instructions for the transmittal of funds. Disbursement of all funds to such State thereafter shall be in the form designated by the Attorney General and made payable to 'The State of _____.' Physical delivery of a check shall be made by the disbursing official to the Attorney General and in the case of a wire transfer, advance written notice of the date and amount of the wire transfer shall be delivered to the Attorney General prior to the sending of each wire transfer. Upon receipt of each check or wire transfer notice, the Attorney General shall deliver it promptly to the Governor of such State. As used in this Paragraph II.B.3.f, 'Attorney General' means the Attorney General of a State, or his or her duly authorized representative, and includes any other State official who intervened in M.D.L. 378 prior to the execution of the Memorandum of Understanding of January 24, 1986 preceding this Agreement. In the case of any State where an official other than or in addition to the Attorney General intervened in M.D.L. 378 prior to January 24, 1986, all references in this Paragraph II.B.3.f to the Attorney General shall mean the Attorney General jointly with such official. Such funds (including interest earned on the funds following their receipt by the States) will be utilized as follows:

i.  Public Notice.  Each State will give reasonable notice to the public that it has received the funds and will generally describe the types of restitutionary programs on which the State may expend the funds. Each State will conduct informal hearings at which the public may present its views concerning such expenditures. Any State which has held hearings with regard to the uses of oil overcharge refunds during the two-year period preceding the date of the Approval Order will not be required to hold additional hearings. Legislative hearings in accordance with applicable State procedures shall be sufficient to comply with the requirements of this subsection.

ii.  Restitutionary   Program.   Monies received by any State shall be utilized to fund one or more existing or new energy-related

programs which are designed to benefit, direct-
ly or indirectly, consumers of petroleum
products within the State.  State governments
are familiar with the particular energy needs
of their citizens. . . . (Emphasis added.)

In re:  The Department of Energy Stripper Well Exemption Litigation,
M.D.L. No. 378, Final Settlement Agreement at 8 (D. Kan. 1983).  Under
that settlement "the state" is to receive the money.  The settlement
states that before a state receives funds the governor must sign
letters of assurance, to be provided by the state's attorney general,
that the money will be spent for approved programs.  Otherwise, the
governor is not mentioned.  There is no basis in the language of the
settlement for arguing that the settlement was intended to give the
governor any role in determining how the funds should be allocated,
much less a role that would be beyond his constitutional powers.  It
is the role of the legislature to comply with the requirements of the
settlement in the allocation of the money, and to appropriate the
money in accordance with that allocation.

## SUMMARY

The legislature, not the governor, has
authority to allocate and appropriate oil
overcharge funds distributed as a result .of two
lawsuits.  Section 155 of Public Law No. 97-377,
96 Stat. 1830 (1982), was not intended to increase
the role of the governor in allocating and
appropriating funds received under that section.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Sarah Woelk
Assistant Attorney General