UNITED STATES of America, Plaintiff–
Appellant, Cross–Appellee,

v.

Arvil LAKE, Defendant–Appellee,
Cross–Appellant.

Nos. 91–6108, 91–6154.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 6, 1992.

Decided Feb. 5, 1993.

James E. Arehart, Asst. U.S. Atty., R. Michael Murphy, Asst. U.S. Atty., Karen K. Caldwell, U.S. Atty., Lexington, KY, Jacquelyn A. Jess, Asst. U.S. Atty., Covington, KY, Thomas M. Gannon (argued and briefed), U.S. Dept. of Justice, Appellate Section, Criminal Div., Washington, DC, for U.S.

Michael Dean (argued and briefed), London, KY, for Lake.

Before: MERRITT, Chief Judge; and NORRIS and BATCHELDER, Circuit Judges.

ALAN E. NORRIS, Circuit Judge.

The government appeals the district court's order granting a judgment of acquittal after a jury had convicted defendant, Arvil Lake, of five counts of operating a coal mine in willful violation of the Federal Mine Safety and Health Act, 30 U.S.C. § 801 *et seq.*, and one count of violating the Explosive Control Act, 18 U.S.C. § 841 *et seq.* The district court concluded that the government failed to prove the interstate commerce nexus required to convict on the mining safety violations, and that his purchase of explosives could not have violated federal law. On appeal, we are asked to decide how much evidence of interstate commerce the government was required to produce, and whether defendant violated the Explosive Control Act when he purchased explosives for his mine while it was under a closure order. Defendant cross-appeals, asserting that the district court improperly denied his motion to dismiss the indictment. For the following reasons, we affirm in part and reverse in part.

## I.

In April 1989, defendant began operating a coal mine in Whitley County, Kentucky, with four men who were compensated based upon the volume of coal produced. These four men worked underground, while defendant directed operations and worked above ground.

Ten days after mining started, Mine Safety and Health Administration (MSHA) Inspector James Payne visited the mine and discovered a number of safety violations, including inadequate ventilation and failure to institute a ventilation plan. He issued citations and closure orders. Defendant was advised that the mine could not be operated until a ventilation plan was approved and the other hazards abated. Nevertheless, defendant returned to the mine the next day and directed the miners to go back to work.

On May 9, 1989, another MSHA inspector appeared at defendant's mine to find it in full operation. He informed the miners that they were operating in contravention of a closure order and again shut down the mine, after finding additional violations and issuing more citations. Defendant purchased underground mining supplies, including explosives, from the Carl Morris Mining Supplies Company, in nearby Knox County. As part of each purchase, he was required to complete a Bureau of Alcohol, Tobacco and Firearms (ATF) form explaining the purpose for which the explosives would be used and certifying that the purpose was lawful.

In December 1989, a federal grand jury in the Eastern District of Kentucky returned a seven-count indictment against defendant, listing six willful safety violations under the Federal Mine Safety and Health Act, and one count of false certification in violation of the Explosive Control Act.[1]

At trial, defendant sought a judgment of acquittal both at the close of the government's proof and at the close of all evidence. The district court overruled both

---

**1.** The seven counts charged that defendant: (1) failed to install line brattices for ventilation at the entry to the mine (30 U.S.C. § 863(c)(1)); (2) had no ventilation plan in place (30 U.S.C. § 863(*o*)); (3) made false certifications on ATF Form 5400.4 in an explosives purchase (18 U.S.C. § 842(a)); (4) failed to provide a "high voltage fused disconnect" on the high voltage power line being used at the mine (30 C.F.R. § 77.800); (5) removed the frame grounds from the two battery chargers and from the 200–amp circuit breaker box supplying power to the mine fan and water pump (30 C.F.R. § 77.700); (6) failed to conduct preshift inspections of the mine (30 U.S.C. § 863(d)); and (7) stored 81 sticks of dynamite and 31 electric detonators in the scoop of a mine tractor close to an energized coal drill (30 C.F.R. § 75.1313). The indictment also cited 30 U.S.C. § 820(d), which permits criminal penalties for willful violations of mining safety standards.

motions, and the jury convicted defendant on all but one count. After the verdict, defendant renewed his motion for judgment of acquittal, and the district court granted the motion on all six counts for which he was convicted. On the mining safety counts, the court held that the government failed to adduce sufficient evidence of a connection between defendant's conduct and interstate commerce. As to the count alleging false representations in the purchase of explosives, the court concluded that the Explosive Control Act was not intended to proscribe the use of explosives in a mine that violated safety regulations.

## II.

■■■ A court must grant a motion for judgment of acquittal when there is not sufficient evidence for a rational trier of fact to have found each element of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). On appeal, the standard is "for all practical purposes identical with the standard imposed on the trial court." *United States v. Fawaz,* 881 F.2d 259, 261 (6th Cir.1989). Although the district court granted the motion for acquittal, we consider the evidence in the light most favorable to the government, since the jury convicted defendant. *See id.*

The jurisdictional section of the Federal Mine Safety and Health Act of 1977[2] provides that "[e]ach coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce, and each operator of such mine, and every miner in such mine shall be subject to the provisions of this chapter." 30 U.S.C. § 803. The Act defines commerce as "trade, traffic, commerce, transportation, or communication among the several States...." 30 U.S.C. § 802(b). On appeal, the government takes issue with the district court's conclusion that it failed to produce sufficient evidence that defen-

dant's operation of the mine affected commerce within the meaning of these provisions. It relies upon four items of evidence to support the jury's finding:

(1) Defendant's operation of the mine and his sale of coal by the ton;

(2) His purchase of mining supplies from Carl Morris Mining Supply;

(3) His use of power supplied by the Cumberland Valley Rural Electric Power Company; and

(4) His failure to object to the MSHA inspectors' exercise of jurisdiction over his mine through their inspections and citations.

### A. Jurisdictional Reach of Statute

■■■ Neither party contests Congress' ability to regulate defendant's mine. The parties disagree, however, as to whether Congress intended to exercise its full authority under the Commerce Clause when it enacted the Federal Coal Mine Health and Safety Act. Because the proof offered by the government on the interstate commerce element of the offense seems a bit thin, we must parse the statute's jurisdictional reach to determine whether the evidence was sufficient to carry the government's burden.

■■■ The statute evidences a remedial purpose and should be broadly construed. *Boich v. Federal Mine Safety & Health Review Comm'n,* 704 F.2d 275, 283 (6th Cir.), *vacated on other grounds,* 719 F.2d 194 (6th Cir.1983). Congress' stated objective in enacting the Federal Coal Mine Health and Safety Act of 1969 was to avert "deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal [or other] mines." 30 U.S.C. § 801 ("Congressional findings and declaration of purpose"). *See also* H.R.Rep. No. 563, 91st Cong., 1st Sess. 1–3 (1969), *reprinted in* 1969 U.S.C.C.A.N. 2503, 2503–05 (recounting recent mining disasters). Also of interest is the congressional finding that "the disruption of production and the loss of income to operators and miners as a result of coal or other mine accidents or

---

**2.** The Federal Mine Safety and Health Act of 1977 superseded the Federal Coal Mine Health and Safety Act of 1969, but retained Congress'

original findings and made only a technical amendment to the jurisdictional section. *See* 30 U.S.C.A. §§ 801, 803.

occupationally caused disease unduly impedes and burdens commerce." 30 U.S.C. § 801(f).

According to the Senate Report accompanying the Federal Coal Mine Safety Act Amendments of 1965, Pub.L. No. 89–376, 80 Stat. 84 (1966), an earlier reform effort extending federal regulation to smaller mines, "[t]he purpose of this bill is to ... increase the protection of lives and property in *all* underground coal mines, *to the maximum extent feasible through legislation.*" S.Rep. No. 1055, 89th Cong., 2d Sess. 1 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2072, 2072 (emphasis added). This certainly indicates that Congress has intended to assert its full commerce power in legislation regulating coal mining. *See Marshall v. Kraynak*, 604 F.2d 231, 232 (3d Cir.1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 643 (1980). Moreover, Congress understands that it exercises its full Commerce Clause authority when, as here, it enacts legislation covering activity which "affects commerce." *Russell v. United States*, 471 U.S. 858, 859 & n. 4, 105 S.Ct. 2455, 2456 & n. 4, 85 L.Ed.2d 829 (1985); *Scarborough v. United States*, 431 U.S. 563, 571, 97 S.Ct. 1963, 1967, 52 L.Ed.2d 582 (1977) (Congress is aware of distinction between legislation covering activities "in commerce" and assertion of full commerce power over all activities "affecting" interstate commerce); *United States v. American Bldg. Maintenance Inds.*, 422 U.S. 271, 280, 95 S.Ct. 2150, 2156, 45 L.Ed.2d 177 (1975) (same). Accordingly, the language of the Act, its broad remedial purpose, and its legislative history combine to convince us that Congress intended to exercise its full power under the Commerce Clause.

### B. Sufficiency of the Evidence on Commerce

■ The district court instructed the jury that interstate commerce is an element of the offense under 30 U.S.C. § 820(d), which the government must prove beyond a reasonable doubt. The government does not dispute this instruction. It is the district court's view of the proof required to establish the commerce element that the government challenges in this portion of its appeal.

In ruling on defendant's post-trial motion for a judgment of acquittal, the district court held that the government "did not show any connection of the mine to interstate commerce," since

[t]he only possible connection with interstate commerce that was introduced at trial was that defendant purchased mining supplies from the Carl Morris supplier in Knox County, but there was nothing to show that Carl Morris purchased supplies manufactured outside Kentucky, or sold supplies to purchasers from outside Kentucky. There was also evidence that the defendant had been using electricity from the Cumberland Valley Rural Electric Cooperative, although it was an illegal connection, inasmuch as the Cumberland Valley R.E.C.C. had not given him permission to use it. One would suspect that Cumberland Valley R.E.C.C. is connected with many other utilities in several states and purchases coal from various suppliers, which would have an effect on interstate commerce, but there was no proof at trial on it.

The court concluded that it was left with the question of "whether as a matter of law the operation of any coal mine would affect commerce without any evidence to support it." The court's review of a number of cases in which mines had at least some connection with commerce of an interstate, as opposed to intrastate, nature led it to conclude that the government failed to produce adequate evidence of the required nexus with interstate commerce.

In our opinion, the district court adopted too restrictive a view of the evidence required to establish that defendant operated a coal mine "the operations or products of which affect commerce." Because, as we have noted, Congress intended to employ the full reach of its Commerce Clause authority, cases construing that authority are instructive. Although earlier cases suggested that Congress could regulate "those intrastate activities which in a *substantial* way interfere with or obstruct" commerce, *see United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942) (emphasis added), recent

precedents significantly broaden that authority by permitting regulation of small scale intrastate activities, where they might be said to affect interstate commerce when combined with similar small scale activities. That principle was firmly established in *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), in which the Supreme Court held that growing wheat solely for consumption on the farm had an impact on interstate commerce. *See id.* at 128–29, 63 S.Ct. at 90–91. In 1975, moreover, the Court underscored the breadth of the Commerce Clause power: "Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975).

This case law leads inexorably to the conclusion that the government did produce sufficient evidence to prove that the "operations or products" of defendant's coal mine affected interstate commerce. There was uncontroverted evidence that defendant operated a coal mine and that its coal was sold locally. He purchased mining supplies from a local dealer and consumed commercially produced electricity. Even if the coal production at defendant's mine was small and sales of coal were entirely local, under the Supreme Court's holdings in *Wickard* and *Fry*, defendant's efforts are deemed to affect interstate commerce, since such small scale efforts, when combined with others, could influence interstate coal pricing and demand.

Although *Wickard* and its progeny define interstate commerce in the civil context, there is no reason to suppose that the same standard does not apply to this criminal prosecution, so long as proof is established beyond a reasonable doubt. *See* 1 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law, § 4.10(b)–(c) (2d ed. 1992). Indeed, that appears to be the view adopted by the Supreme Court. In *Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), the defendant contended that a federal explosives and arson statute could not, consis-

tent with the Commerce Clause, be applied to his conduct in attempting to burn a two-unit apartment building he owned. The statute prohibited the burning of "any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). The Court concluded that because the building was used for the rental of apartment units, it was used in an activity affecting commerce.

> The rental of real estate is unquestionably [an activity that affects commerce]. We need not rely on the connection between the market for residential units and 'the interstate movement of people,' to recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.

471 U.S. at 862, 105 S.Ct. at 2457 (footnotes omitted).

The same rationale applies here. Just as evidence of apartment rentals in *Russell* demonstrated a commerce connection, the government's proof of defendant's production and sale of coal permitted the jury to find that his mine affected the interstate market in coal. Because the government established these facts beyond a reasonable doubt, it met its constitutional burden of proof on the commerce element of the crime. Accordingly, we reverse the district court's judgment of acquittal on the five mining safety offenses.

### III.

■ Four times in the spring of 1989, defendant purchased mining supplies from the Carl Morris Mining Supplies Company. As part of each purchase, he completed ATF form 5400.4 by checking the box titled "mining" in response to the question, "Show what use will be made of explosive materials." He also signed the following certification:

> I hereby certify that the answers to the above are true and correct.... I ...

understand that the making of any false oral or written statement or the exhibiting of any false or misrepresented identification with respect to this transaction is a crime punishable as a felony. I also certify that I have a legitimate use for the explosive materials for the purpose stated in Item 9[3] above and that the explosive materials hereby obtained will be used in such lawful activity....

The indictment alleged that the certifications were false because defendant "then and there well knew that the explosive materials were to be used at an illegal mining operation." He was charged with violating 18 U.S.C. § 842(a)(2), which provides that it "shall be unlawful for any person ... knowingly to withhold information or to make any false or fictitious oral or written statement ... intended or likely to deceive for the purpose of obtaining explosive materials." To enforce this provision, the ATF requires purchasers of explosives to complete form 5400.4. *See* 27 C.F.R. § 55.105 (1992).

The government's theory was that opening the mine without a license, operating it in violation of safety regulations, and continuing to operate in the face of a closure order combined to make defendant's mining operation illegal, and hence his use of the explosives unlawful. As a result, his certification that he had a legitimate use for the explosives was false.

We agree with the district court that such a theory is untenable.

Although the legislative history underlying passage of the Explosive Control Act betrays a concern with a rash of terroristic bombings, *see* H.R.Rep. No. 1549, 91st Cong., 2d Sess. 7 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4013, the purpose of the Act was said to be broader: "to protect interstate and foreign commerce against interference and interruption by reducing the hazards to persons and property arising from explosives misuse and unsafe or insecure storage." *Id.* "It is not the purpose of this provision," the House report adds, "to place any undue or unnecessary restric-

tions or burdens on law-abiding citizens with respect to the acquisition, possession, storage or use of explosives for legitimate industrial, *mining* or agricultural purposes." *Id.* (emphasis added). This limiting gloss points out the desire of Congress to avoid undue interference with purchases of explosives for the very purpose for which they were bought here—mining.

We suspect that most mines garner MSHA citations of one type or another at some time during their operation. The government's reading of the Act would transform these regulatory violations into felonies any time a mine operator purchases mining explosives. We are unwilling to sanction such an expansive construction of the statute, as we agree with the district court's observation that

> when a purchaser certifies that explosives are being purchased for a "lawful" activity, that was meant to cover conduct that is illegal *per se*, rather than conduct that is *malum prohibitum*. As the operation of a coal mine without a permit is *malum prohibitum*, the Court does not find that the statute was designed to prohibit the conduct [encompassed by the government's theory].

Defendant did not lie about his intended use of the explosives. He stated that they were to be used in mining, that he had a legitimate use for them, and that they would be used in that lawful activity. The use of explosives in mining is a "legitimate use" of explosives in a "lawful activity." We affirm the district court's judgment of acquittal on the explosives count.

## IV.

After the government appealed, defendant filed a cross-appeal. We reach the cross-appeal since we have reinstated the convictions on the counts to which the cross-appeal is directed. Defendant first asserts that the court should have granted his motion to dismiss the count charging that he failed to have in place a plan for the ventilation of his mine, in violation of 30 U.S.C. § 863(*o*).[4]

---

**3.** Item 9 is the box defendant checked showing his use of the explosives for mining.

**4.** That section provides: "A ventilation system and methane and dust control plan and revi-

sions thereof suitable to the conditions and the mining system of the coal mine and approved by the Secretary shall be adopted by the operator and set out in printed form."

The Act prohibits willful violations of "mandatory health or safety standard[s]." 30 U.S.C. § 820(d). Defendant's contention that § 863(o) is not a mandatory safety standard is contradicted by the plain language of the Act. Section 863(o) expressly requires a mine operator to adopt a ventilation plan, and the Act provides that "[t]he provisions of section 862 through 878 of this title shall be interim mandatory safety standards." 30 U.S.C. § 861(a).

Defendant's second assertion of error, that a count of the indictment was improperly amended at trial, also lacks merit, since the court merely corrected a typographical error in the citation of a statute. This alteration did not constitute an impermissible amendment of the indictment because it did not alter the charging terms. *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir.1989), *cert. denied*, 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990).

## V.

For the foregoing reasons, the order of the district court is affirmed in part and reversed in part, and this cause is remanded to that court with instructions to reinstate the verdicts of guilty on the five mining safety offenses.