**D.A.S. SAND & GRAVEL, INC. Petitioner,**

v.

**Elaine L. CHAO, United States Secretary of Labor, Mine Safety and Health Administration, and Federal Mine Safety and Health Review Commission, Respondents.**

No. 03–40668.

United States Court of Appeals, Second Circuit.

Argued: May 10, 2004.

Decided: May 26, 2004.

David A. Scheer, Newark, NY, for Petitioner.

Robin A. Rosenbluth, Senior Attorney (Howard M. Radzely, Solicitor of Labor, on the brief, Edward P. Clair, Associate Solicitor, W. Christian Schumann, Counsel, Appellate Litigation, of counsel), Office of the Solicitor, U.S. Department of Labor, Arlington, VA, for Respondents Chao and Federal Mine Safety and Health Administration.

Thomas Stock, Federal Mine Safety and Health Commission, Washington, D.C., for Respondent Federal Mine Safety and Health Review Commission.

Before: FEINBERG, MESKILL, and CABRANES, Circuit Judges.

PER CURIAM.

The principal questions presented by this appeal are (1) whether, in enacting the Federal Mine Safety and Health Amendments Act of 1977 ("the Mine Act" or "the

Act"), Pub.L. No. 95–164, 91 Stat. 1290, codified at 30 U.S.C. § 801 *et seq.*, Congress intended to regulate mines like that operated by petitioner, the products of which are sold only to intrastate purchasers; and (2) if so, whether Congress has the authority under the Commerce Clause to regulate such mines.

## BACKGROUND

The Mine Act charges the Secretary of Labor with promulgating mandatory safety and health standards for the nation's mines and enforcing those standards by means of regular inspections. *See* 30 U.S.C. §§ 811, 813. Section 4 of the statute provides that regulations promulgated by the Secretary of Labor under the Act apply to "[e]ach coal or other mine, the products of which enter commerce, or the operations or products of which affect commerce ...." *Id.* § 803. The Act defines "commerce" as "trade, traffic, commerce, transportation, or communication among the several States ...." *Id.* § 802(b).

After inspectors of the Mine Safety and Health Administration within the Department of Labor inspected the mine operated by petitioner D.A.S. Sand & Gravel, Inc. ("DAS") and cited it for several regulatory violations under the Act, DAS contested the citations before an Administrative Law Judge of the Federal Mine Safety and Health Review Commission ("the Commission").[1]

DAS argued primarily that Section 4 of the Act does not apply to mines like that operated by DAS—a New York mine the products of which are undisputedly sold only to purchasers within the State of New York. *See Secretary of Labor v. D.A.S. Sand & Gravel, Inc.*, 25 FMSHRC 364, 367 (July 7, 2003) ("*D.A.S.*"). The administrative law judge rejected DAS's argument that DAS's mine is not subject to regulation under the Mine Act, *see id.* at 367–69, and DAS's subsequent petition to the Commission for discretionary review[2] was denied on August 18, 2003. DAS timely appealed to our Court pursuant to Section 106 of the Mine Act, 30 U.S.C. § 816, which provides us with jurisdiction to review decisions of the Commission.

## DISCUSSION

### I. Congressional Intent

■ DAS argues, first, that the Commission misinterpreted the Mine Act by holding that the Act applies to mines the products of which are sold entirely intrastate, such as the mine operated by DAS. Petitioner claims that, because the Act defines "commerce" as occurring "among the several States ...," *id.* § 802(b), and DAS, the operator of a New York mine, sells the mine's products entirely within the State of New York, the mine operated by DAS does not qualify as a mine "the products of which enter commerce, or the operations or products of which affect commerce," *id.* § 803.

---

1. The Federal Mine Safety and Health Review Commission is an adjudicatory body independent of the Department of Labor that adjudicates claims challenging the Department of Labor's enforcement of the Mine Act. *See* 30 U.S.C. § 823; *see also Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Comp. Programs, Dep't of Labor*, 519 U.S. 248, 267–68, 117 S.Ct. 796, 136 L.Ed.2d 736 (1997); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 204, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994).

2. The Act provides that an aggrieved party may seek a second level of review from the Commission after an initial adverse decision, but that such a second review is discretionary. 30 U.S.C. § 823(d). Unless a petition for discretionary review has been granted, the original administrative law judge's decision becomes a final decision of the Commission forty days after its issuance. *Id.*

When we review an agency's interpretation of a statute, we must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress has spoken unambiguously, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. In determining whether a particular provision is unambiguous, we consider "the particular statutory language at issue, as well as the language and design of the statute as a whole, and where appropriate, its legislative history." *Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 198 (2d Cir.2004) (internal quotation marks and citation omitted) (interpreting the Energy Policy and Conservation Act, as amended by the National Appliance Energy Conservation Act). In the instant case, all three of these factors—the language of Section 4, the language and design of the Mine Act as a whole, and the Act's legislative history—lead us to conclude that the language of Section 4 of the Mine Act unambiguously expresses Congress's intent to regulate mines to the full extent of its power under the Commerce Clause.

Turning first to the plain language of the statute, it is well established that "the statutory term 'affecting ... commerce,' ... when unqualified, signal[s] Congress' intent to invoke its full authority under the Commerce Clause." *Jones v. United States*, 529 U.S. 848, 854, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000); *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (reaffirming in an opinion interpreting the Federal Arbitration Act that the "familiar term 'affecting commerce' " consists of "words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power"); *accord United States v. Lake*, 985 F.2d 265, 267–68 (6th Cir.1993) (holding that the language of the Mine Act, its broad remedial purpose, and its legislative history establish that Congress intended to exercise its full power under the Commerce Clause); *Marshall v. Kraynak*, 604 F.2d 231, 232 (3d Cir.1979) (stating that "[i]n enacting [Section 4 of the Mine Act], Congress intended to exercise its authority to regulate interstate commerce to 'the maximum extent feasible through legislation' ") (citation omitted).

The language and design of the Mine Act as a whole support our interpretation of Section 4. In Section 2 of the Act, Congress articulated findings that led to the Act's adoption, including "an urgent need to ... improv[e] the working conditions and practices in the Nation's coal or other mines," because "the disruption of production and the loss of income" caused by mining accidents and mining-related illnesses "unduly impede[] and burden[] commerce." 30 U.S.C. § 801(c), (f). Moreover, Congress found that "the existence of unsafe and unhealthful conditions and practices in the Nation's coal or other mines is a serious impediment to the growth of the coal or other mining industry ...." *Id.* § 801(d). The Supreme Court has stated that "[t]hese congressional findings [contained in the preamble to the Mine Act] were based on extensive evidence showing that the mining industry was among the most hazardous of the Nation's industries." *Donovan v. Dewey*, 452 U.S. 594, 602 n. 7, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (citing evidence contained in the legislative history of the Act).

These provisions support the position of the administrative law judge that the Act evinces Congress's intent "to regulate the

business of mining because of the nature of mining activity and not because of the business economics that determine the geographic service area of a particular mine." *D.A.S.*, 25 FMSHRC at 369. Accordingly, these provisions provide no support for DAS's argument, *see* Petitioner's Br. at 10, that Congress, in adopting the Mine Act, did not intend to regulate mines like that operated by D.A.S.

Finally, the legislative history of the Mine Act corroborates our interpretation of Section 4. The Senate Report accompanying the bill that would become the Mine Act reads, in relevant part:

> [I]t is the Committee's intention that what is considered to be a mine and to be regulated under this Act be given the broadest possibl[e] interpretation, and it is the intent of this Committee that doubts be resolved in favor of inclusion of a facility within the coverage of the Act.

S.Rep. No. 95–181, at 14 (May 15, 1977), *reprinted in* 1997 U.S.C.C.A.N. 3401, 3414.

Accordingly, having considered "the particular statutory language [of Section 4], as well as the language and design of the statute as a whole, and . . . the legislative history," *Abraham*, 355 F.3d at 198, we conclude that Section 4 unambiguously indicates that Congress intended to regulate mines to the full extent of its power under the Commerce Clause.

## II. Commerce Clause Power

■ Of course, to hold that Congress intended, by adopting the Mine Act, to regulate mines to the full extent of its power under the Commerce Clause does not by itself establish that DAS is subject to the Act. Rather, it collapses the first question presented in this case (whether Congress intended to regulate DAS under the Mine Act) and the second (whether regulation of DAS is within Congress's power under the Commerce Clause). In sum, if regulation of DAS's mine, the products of which are sold entirely intrastate, is within Congress's power under the Commerce Clause, then the mine is within the scope of Section 4 of the Mine Act, and is therefore subject to regulations promulgated by the Secretary of Labor.

Petitioner argues that regulation of mines the products of which are sold entirely intrastate is beyond the power of Congress under the Commerce Clause. However, the Supreme Court has long held that the Commerce Clause does not preclude Congress from regulating the activities of an economic actor whose products do not themselves enter interstate commerce, where the activities of such local actors taken together have the potential to affect an interstate market the regulation of which is within Congress's power. *See Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *see also Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975) ("Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States . . . ."). No one disputes Congress's power to regulate the mining industry under the Mine Act. Accordingly, just as in *Wickard* a farmer who grew wheat solely for personal consumption was subject to regulations applicable to the nationwide wheat market, *see Wickard*, 317 U.S. at 127–28, 63 S.Ct. 82, the mine operated by DAS is subject to the regulations imposed on the mining industry under the Mine Act. *See Lake*, 985 F.2d at 269 ("Even if the coal production at defendant's mine was small and sales were entirely local, under the Supreme Court's holdings in *Wickard* and *Fry*, defendant's efforts are deemed to affect interstate commerce, since such small ef-

314

forts, when combined with others, could influence interstate coal pricing and demand.").

## CONCLUSION

In conclusion, we hold (1) that Section 4 of the Mine Act unambiguously expresses Congress's intent to regulate the mining industry to the full extent of its power under the Commerce Clause, and (2) that Congress's power under the Commerce Clause includes the power to regulate mines whose products are sold entirely intrastate, such as that operated by DAS. Accordingly, we affirm the Decision of the Federal Mine Safety and Health Review Commission.